# EXHIBIT A



*Biomedical Engineering*

**Re: Ramkelawan v. Globus Medical**

**Expert Report of Nicholas M. Benetatos, Ph.D.**



Exponent
3440 Market Street
Suite 600
Philadelphia, PA 19104

telephone 215-594-8800
facsimile 215-594-8899
www.exponent.com

**Re: Ramkelawan v. Globus
Medical**

**Expert Report of
Nicholas M. Benetatos, Ph.D.**

Prepared for

Denise B. Bense, Esquire
Cozen O'Connor
200 Four Falls Corporate Center, Suite 400
West Conshohocken, PA 19428-0800

Prepared by

Nicholas M. Benetatos, Ph.D.
3440 Market Street, Suite 600
Philadelphia, PA 19104

June 10, 2019

© Exponent, Inc.

# Contents

Page

**List of Appendices**                                                            **iv**

**List of Figures**                                                               **v**

**List of Tables**                                                                **vi**

**Limitations**                                                                   **vii**

**1    Introduction**                                                             **1**

    1.1    Scope of Work                                                          1

    1.2    Qualifications and Compensation                                        1

    1.3    Information Considered                                                 2

**2    Opinions**                                                                 **3**

**3    Device and Regulatory Background**                                         **4**

    3.1    General Regulatory Background                                          4

    3.2    Device Description and Relevant Manufacturing Information              4

    3.3    Classification of Medical Devices                                      7

    3.4    Pre-Market Requirements                                                11

        3.4.1    Clinical Studies and Investigational Device Exemptions          11

        3.4.2    PMA Non-Clinical Data for SECURE-C cervical artificial disc     14

        3.4.3    PMA Clinical Data for SECURE-C: Overview                        17

        3.4.4    PMA Quality System (QS) Requirements                           20

        3.4.5    Pre-Approval Inspection                                         23

    3.5    Post-Market Requirements                                              24

        3.5.1    Post-Market Changes to Approved Class III Products             24

        3.5.2    Conditions of Approval                                          27

        3.5.3    Post-Approval Study and Adverse Events                          27

**4    Analysis and Discussion**                                                  **29**

    4.1    Opinion 1 – The FDA approval of the SECURE-C PMA, based on the totality of
    the data provided, affirms that the design and manufacturing of the SECURE-C cervical
    total artificial disc (core and endplates) are safe and efficacious for their intended use. 29

4.2    Opinion 2 – The PMA approval affirms that the manufacturing process to produce the SECURE-C cervical total artificial disc and the quality control framework in which the device components (core and endplates) are manufactured met the most rigorous FDA requirements. As Globus Medical met these requirements in the manufacturing of the subject SECURE-C (core and endplates) - there is no basis to support any opinion that: the subject device (core and endplates) was defectively manufactured, the production of the subject device yielded defective and undetected product that would pose a significant risk to patient safety, or that the manufacturing process and quality management system that governs that process are deficient.                31

4.3    Opinion 3 – It is critical to consider that the performance of medical devices is multifactorial and includes numerous device, surgical, and patient factors. The clinical study data and post-market safety data relating to potential core migrations of the SECURE-C cervical total artificial disc do not support any opinion that the subject device was defectively manufactured or that the manufacturing process produces undetected and defective products.                37

5        **Rebuttal of Plaintiffs' Expert Reports**                **40**

5.1    Report of Russell F. Dunn, Ph.D., P.E.                40

5.2    Report of John D. Jarrell, Ph.D., P.E.                44

6        **Summary of Opinions**                **46**

# List of Appendices

Appendix A.   CV of Nicholas Benetatos, Ph.D.

Appendix B.   List of Materials

Appendix C.   PMA Acceptance and Filing Review Checklist

# List of Figures

Figure 1.    Image of the SECURE-C cervical artificial disc                                          5

Figure 2.    Manufacturing Production Flow of the SECURE-C cervical total artificial
             disc.                                                                                    6

# List of Tables

Table 1.    Summary of Non-Clinical Testing (Laboratory Testing) for SECURE-C
            Cervical Artificial Disc.                                              15

Table 2.    Summary of Non-Clinical Testing (Animal Testing) for SECURE-C
            Cervical Artificial Disc.                                              16

Table 3.    Required Quality Systems Content for PMA Submission.                   21

Table 4.    Required Manufacturing Content for PMA Submission.                     22

Table 5.    Description of PMA Supplement Types and Regulations for Post-Approval
            Changes.                                                               26

# Limitations

Exponent, Inc. ("Exponent") was retained by counsel for Globus Medical, Inc. to review documents, perform analysis and provide opinions and testimony related to the United States District Court, Middle District of Florida, Ocala Division, Winston Ramkelawan and Vindra Ramkelawan v. Globus Medical, Inc., and Globus Medical North America, Inc. (CASE NO.: 5:18-cv-100-JSM-PRL). This report summarizes work performed to-date and presents the findings resulting from that work. The findings presented herein are made to a reasonable degree of scientific certainty. Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material or information as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

Although trial exhibits have not been prepared at this time, Exponent may use any and all of the information described or referenced in this report. Additionally, Exponent may use existing materials for demonstrative purposes.

# 1   Introduction

## 1.1  Scope of Work

1.   This report presents my opinions and bases for those opinions as they relate to the Ramkelawan v. Globus Medical matter. Exponent has been retained by Cozen O'Connor, who is representing Globus Medical, Inc. to address the SECURE-C cervical total artificial disc regulatory actions taken in support of marketing the device.

2.   The SECURE-C cervical total artificial disc is an articulating intervertebral device comprised of two endplates and a central core and is manufactured by Globus Medical, Inc. (the sponsor). The device is indicated for reconstruction of the disc in skeletally mature patients at one level from C3-C7 following single-level discectomy for intractable radiculopathy (arm pain and/or a neurological deficit) with or without neck pain, or myelopathy due to a single-level abnormality localized to the disc space and at least one of the following conditions confirmed by radiographic imaging (CT, MRI, X-rays): herniated nucleus pulposus, spondylosis (defined by the presence of osteophytes), and/or visible loss of disc height as compared to adjacent levels.[1]

## 1.2  Qualifications and Compensation

3.   I am a Manager in the Biomedical Engineering Practice at Exponent. My curriculum vitae is attached as Appendix A. I hold the following degrees:

- B.S. degree (2), Chemistry and Physics, from St. Joseph's University, 2000, 2001
- MSE degree, Materials Science and Engineering, University of Pennsylvania, 2004
- Ph.D., Materials Science and Engineering, University of Pennsylvania, 2006

4.   I have extensive experience in medical devices, combination products, in-vitro diagnostics, and their associated regulations including elements of pre- and post-market regulatory affairs. Prior to joining Exponent, I held positions of direct responsibility for the success of regulatory approvals at Fortune 100 organizations and I spent seven years at the US Food and Drug Administration (FDA) in the Center for Devices and Radiological Health (CDRH). While employed at the FDA, I participated in the review and decision-making process

---

[1] GM 003396

for numerous regulatory submissions for Class II and Class III medical devices, diagnostics, and combination products. I participated in inspection and audit activities. I served on FDA health hazard evaluation (HHE) and risk assessment (HRA) committees and served as a member of the CDRH Science Council. I have been directly involved with various medical device types including: cardiovascular and interventional cardiology devices, orthopedics, ophthalmic devices, drug-delivery systems, biodegradable/bioabsorbable implants, diabetes devices, and active implantable electronic devices.

5.   Exponent is being compensated at my current standard billing rate of $330 per hour for the time I spend on researching, reviewing, forming opinions, and providing testimony. Other Exponent consultants who assist me have different hourly rates. I have no financial interest in the outcome of this litigation. I have no prior testimony.

## 1.3  Information Considered

6.   I considered the documents listed in Appendix B in reaching the opinions presented in this report. I also relied on my education, general experience in the field, and knowledge acquired through years of research and consulting work in the field of medical devices and regulatory affairs. Specific documents and materials that I relied upon in reaching the opinions in this report are referenced throughout the text.

# 2  Opinions

7.  My main opinions in this matter are summarized below:

- Opinion 1 – The FDA approval of the SECURE-C PMA, based on the totality of data provided, affirms that the design and manufacturing of SECURE-C cervical total artificial disc (core and endplates) are safe and efficacious for their intended use.

- Opinion 2 – The PMA approval affirms that the manufacturing process to produce the SECURE-C cervical total artificial disc and the quality control framework in which the device is manufactured met the most rigorous FDA requirements. As Globus Medical met these requirements in manufacturing the subject SECURE-C (core and endplates) - there is no basis to support any opinion that: the subject device (core and endplates) was defectively manufactured, the production of the subject device yielded defective and undetected product that would pose a significant risk to patient safety, or that the manufacturing process and the quality management system that governs that process are in any way deficient.

- Opinion 3 – It is critical to consider that the performance of medical devices is multifactorial and includes numerous device, surgical, and patient factors. The clinical study data and post-market safety data relating to potential core migrations of the SECURE-C cervical total artificial disc do not support any opinion that the subject device was defectively manufactured or that the manufacturing process produces undetected and defective products.

8.  In addition to these main opinions, I have reached additional sub-opinions and rebuttal opinions to Plaintiffs' experts, which are described in subsequent sections of this report. The bases for my opinions are also provided throughout the remainder of the report.

# 3   Device and Regulatory Background

## 3.1   General Regulatory Background

9.   The SECURE-C cervical total artificial disc is an articulating intervertebral device comprised of two endplates and a central core. The device is Class III in the US and received approval on September 28, 2012.[2] The SECURE-C cervical total artificial disc is indicated for reconstruction of the disc in skeletally mature patients at one level from C3-C7 following single-level discectomy for intractable radiculopathy (arm pain and/or a neurological deficit) with or without neck pain, or myelopathy due to a single-level abnormality localized to the disc space and at least one of the following conditions confirmed by radiographic imaging (CT, MRI, X-rays): herniated nucleus pulposus, spondylosis (defined by the presence of osteophytes), and/or visible loss of disc height as compared to adjacent levels.[3]

10. Based on the descriptions of the SECURE-C cervical total artificial disc, its mechanism of action, and its intended use, this device is categorized into FDA product code MJO,[4] orthopedic device - intervertebral disc prosthesis.

## 3.2   Device Description and Relevant Manufacturing Information

11. The SECURE-C is a cervical spine intervertebral device designed to allow motion in flexion, extension, lateral bending, and axial rotation while being constrained by ligaments and posterior elements. The endplates of the device are constructed from a cobalt chrome alloy (CoCrMo) and the core is constructed from ultra-high molecular weight polyethylene (UHMWPE). An image of the device is shown in Figure 1.[5]

---

[2] GM 003396 – GM 003401

[3] GM 003402 – GM 003451

[4] GM 003396 – GM 003451

[5] GM 003402 – GM 003451



Figure 1.        Image of the SECURE-C cervical artificial disc [6]

12. Contraindications for the device include an active or localized infection, osteoporosis or osteopenia, marked cervical instability, allergy or sensitivity to materials of construction, and a list of spine conditions like severe facet arthropathy, severe spondylosis, and/or significant cervical deformities.[7]

13. The device is available in multiple footprints, lordotic angles, and heights to accommodate for patient anatomy.

14. The materials of construction for the SECURE-C cervical artificial disc have been used extensively in medical and orthopedic applications. The device components are constructed from the following materials:

- Endplates – cobalt-chrome-molybdenum alloy (CoCrMo) per ISO 5832-12 and ASTM F1537 standards.[8]

- Superior/Inferior (body contacting) surfaces – plasma sprayed with pure titanium per ISO 5832-2, ASTM F1580, ASTM F1978, ASTM F1147, and ASTM C-633 standards.[9]

- Core – Ultra High Molecular Weight Polyethylene (UHMWPE) per ISO 5834-2 and ASTM F648 standards.[10]

---

[6] GM 003402 – GM 003451
[7] GM 003402 – GM 003403
[8] GM 015561 – GM 15693
[9] GM 015561 – GM 15693
[10] GM 015561 – GM 15693

15. The SECURE-C cervical total artificial disc is manufactured via the scheme depicted below that details production flow and in-process evaluations. (Figure 2).[11]



Figure 2.        Manufacturing Production Flow of the SECURE-C cervical total artificial disc.[12]

---

[11] GM 015561 – GM 15693

[12] GM 015622

16. With respect to the manufacturing of the UHMWPE core, the raw material powder is supplied by Celanese (formerly Ticona).[13] Subsequent processing of this raw material via ram extrusion into UHMWPE rods is conducted by Orthoplastics. Following a post-processing treatment that consists of annealing treatments and packaging of the UHMWPE rod, Eptam Plastics fabricates the UHMWPE core for the SECURE-C cervical total artificial disc according to specifications.

17. Once received, Globus Medical performs inspections, cleans the components, and conducts sterilization and final packaging activities.[14] Appropriate documentation activities occur throughout.

18. With respect to the manufacturing of the inferior endplate, the CoCr materials are produced by Carpenter Technology Corporation according to ASTM F799-11 (chemistry only) and ASTM F1537 (Alloy 1 Warm Worked) standards.[15] The rod stock material is then distributed by Titanium Industries to DRT Medical, where the CoCr rod stock is cut into ¾-inch diameter by 8-inch long pieces which are subsequently machined, grinded, polished, and ultrasonically cleaned.[16] After polishing and inspections, the endplates are then titanium plasma sprayed by APS-Materials, Inc.[17] The components are then passivated, laser marked, and shipped to Globus Medical for packaging and sterilization. Appropriate documentation activities occur throughout.

## 3.3  Classification of Medical Devices

19. The Medical Device Amendments to the Federal Food, Drug, and Cosmetic (FD&C) Act, enacted on May 28, 1976, directed the FDA to issue regulations that classify all medical devices into one of three regulatory control categories: Class I, Class II, or Class III.[18] The classification of a medical device depends upon the degree of regulation necessary to provide a

---

[13] GM 000031 – GM 000039

[14] GM 015462 – GM 015476

[15] GM 000168 – GM 000170

[16] GM 000121 ; GM 000167

[17] GM 000166

[18] Guidance for Industry and Food and Drug Administration Staff: The 510(k) Program:  Evaluating Substantial Equivalence in Premarket Notifications [510(k)]

reasonable assurance of safety and effectiveness and is based on risk. The classification determines the requirements that a medical device manufacturer must meet prior to distributing their device in the market. The three classes of medical devices in the Unites States are as follows[19]:

- Class I:  Devices are subject to a set of general controls which are applicable to all classes of devices. General controls may include: establishment registration and device listing; prohibitions against adulteration and misbranding; keeping of records and reports; and Current Good Manufacturing Practices (CGMP).

- Class II:  Devices for which general controls, by themselves, are insufficient to provide reasonable assurance of the safety and effectiveness of the device, and for which there is sufficient information to establish special controls to provide such assurance. Special controls can include: performance standards, post market surveillance, patient registries, development of guidelines (including guidelines for the submission of clinical data). Class II devices require a pre-market submission, a 510(k) submission, which is made to FDA to demonstrate that the subject device is "substantially equivalent" to another legally marketed device – the predicate device. The term substantially equivalent means that with respect to the predicate device, the subject device has the same intended use, indications for use and technological characteristics such as design, materials of construction, and physical characteristics. In evaluating substantial equivalence, FDA generally evaluates performance data such as mechanical behavior (e.g. strength, wear, fatigue, etc.), electrical properties, sterility, biocompatibility, etc.

- Class III:  Devices for which general controls, by themselves, are insufficient and for which there is not sufficient information to establish special controls to provide reasonable assurance of the safety and effectiveness. Class III devices are the highest risk category of devices and require premarket approval.

---

[19] Guidance for Industry and Food and Drug Administration Staff:  The 510k Program: Evaluating Substantial Equivalence in Premarket Notifications (510k)

20. The classification and the resulting criteria for how medical devices are regulated are based on the perceived level of risk associated with each device/injury/illness weighed against the probable benefits to health resulting from use of the device. Class I devices present the lowest risk, while Class III devices present the highest level of risk. In assessing benefit-risk factors for medical devices, FDA considers evidence and data available - including reliable input from representative samples to help ensure that informed and science-based decisions are made to the greatest extent practicable.[20] It is important to note that all devices have some level of anticipated risk, there is never 100% certainty when determining reasonable assurance of safety and effectiveness.[21] The use of mitigations can minimize the probability of a harmful event occurring and improve the benefit-risk profile.[22]

21. The information from any clinical and/or non-clinical testing reviewed in a pre-market submission is considered during FDA's benefit-risk determination. A pre-market application (PMA) for approval of Class III devices contains scientific and regulatory documentation required to demonstrate safety and effectiveness of the product. The content of a PMA includes administrative, technical, and regulatory elements.[23] The technical sections contain data and evidence that allow FDA to review and determine that the device and its manufacturing produce a finished final form product that is safe and effective for its intended use and user population. Technical sections include both non-clinical scientific laboratory studies (e.g. microbiology, toxicology, immunology, biocompatibility, stress, wear, shelf life, and other laboratory or animal tests) and clinical investigations (clinical study protocols, safety and effectiveness data, adverse reactions and complications, device failures and replacements, patient information, patient complaints, tabulations of data from all individual subjects, results of statistical analyses, etc.). The manufacturing section of a PMA must include all information to demonstrate good manufacturing practices and compliance to the quality system (QS) regulations. In this section, a

---

[20] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider Regarding Benefit-Risk in Medical Device Product Availability, Compliance, and Enforcement Decisions

[21] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider When Making Benefit-Risk Determinations in Medical Device Pre-Market Approval and de novo Classifications

[22] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider When Making Benefit-Risk Determinations in Medical Device Pre-Market Approval and de novo Classifications

[23] Guidance for Industry and Food and Drug Administration Staff: Acceptance and Filing Reviews for Pre-Market Approval Applications (PMAs)

complete description of the methods, facilities, and controls used in device production allow the FDA to evaluate whether adequate quality controls are employed throughout the entire production of the medical device.[24] All elements of a PMA application are expected to include valid scientific data and analysis based on sound scientific reasoning.[25]

22. When submitting a PMA application, FDA expects that all of the required content for the review to take place are present in the documentation. The PMA regulation (21 CFR 814.42(e)) identifies the criteria that, if not met, may serve as a basis for refusing to even file a PMA.[26] FDA has provided guidance to industry and its review staff regarding the broad preclinical and clinical issues that need to be addressed in a PMA and the key decisions that are made during the PMA filing process. FDA staff use this guidance to conduct an acceptance review of all original PMAs they receive. The criteria are published in the "Checklist for Acceptance Review" (see Appendix C) to ensure that the PMA is administratively complete. For the application to be accepted, all organizational and administrative elements need to be present. If one or more of the items on the Inventory of Organizational and Administrative Elements within the Acceptance Checklist are not present, the staff conducting the acceptance review "refuse to accept (RTA)" the submission and notify the sponsor.

23. Once a PMA application is found to be administratively complete, FDA staff begin the filing review. FDA has also published the "Checklist for Filing Review" in its guidance for industry and FDA staff (See Appendix C). The objective of the filing review is to determine the basic adequacy of all technical elements of the PMA.[27] For the application to be filed, the content should be sufficiently complete to permit a substantive technical review. Thus, FDA does not accept PMAs in which significant content is missing or does not contain the required elements. After the submission is filed, the substantive review of the PMA evaluates and interrogates the evidence leading to a knowledgeable science-based decision regarding the safety and effectiveness of the product.

---

[24] Guidance for Industry and Food and Drug Administration Staff: Quality System Information for Certain Pre-Market Application Reviews

[25] Guidance for Industry and Food and Drug Administration Staff: Acceptance and Filing Reviews for Pre-Market Approval Applications (PMAs)

[26] Guidance for Industry and Food and Drug Administration Staff: Acceptance and Filing Reviews for Pre-Market Approval Applications 2019

[27] Guidance for Industry and Food and Drug Administration Staff: Acceptance and Filing Reviews for Pre-Market Approval Applications

24. For established medical device types, the nonclinical (i.e. laboratory) and clinical studies expected in a PMA submission are well known both within FDA and within the medical device industry. This information is often included as part of a subject specific FDA guidance document and/or consensus standards. The substantive PMA review process is the stage at which FDA subject matter experts review and interrogate (i.e. scrutinize and question) the technical elements of the submission. For example, medical officers review the clinical data; engineering experts review the functional and performance testing results, veterinarians review animal testing, etc. The manufacturing section of the PMA is reviewed by experts within the Office of Compliance who are trained and experienced in CGMP and quality systems regulations. During this process, all elements of the PMA content are thoroughly reviewed and any inquiries regarding the content are directed to the sponsor.

## 3.4  Pre-Market Requirements

### 3.4.1  Clinical Studies and Investigational Device Exemptions

25. Medical devices can be evaluated using clinical and non-clinical testing methods. Clinical testing methods can include randomized clinical trials in the appropriate target population, well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well- documented case histories conducted by qualified experts, reports of significant human experience, and testing on clinically derived human specimens such as DNA, tissue, organ and cadaver studies.[28] Non-clinical testing methods include performance testing for product safety/reliability/characterization, testing under simulated conditions of use, animal/cell-based studies or computer simulations. Both clinical and non-clinical testing methods may be used to assess the probability or severity of a given risk, and/or the success of risk mitigation.[29]

26. A great deal of emphasis is placed on the importance of clinical data in demonstrating the safety and effectiveness of a medical device. The FD&C act establishes a framework for

---

[28] Guidance for Industry and Food and Drug Administration Staff:  Acceptance and Filing Reviews for Pre-Market Approval Applications

[29] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider When Making Benefit-Risk Determinations in Medical Device Pre-Market Approval and de novo Classifications

FDA to grant an exemption so that qualified experts with appropriate experience and scientific training can study unapproved devices in-vivo.[30] This exemption is known as an Investigational Device Exemption (IDE). For all Class III devices requiring clinical studies, the sponsor is required to submit an IDE application and obtain FDA approval prior to beginning clinical studies.

27. The information to be included in an IDE submission can vary depending upon the device and the purpose of the investigation. FDA has provided specific guidance to industry and its staff regarding the preparation, content, and review of IDE submissions for total artificial discs.[31] In this guidance document the following elements are listed as required elements:

- Device Description including the following: Intended use, indication for use, engineering drawings complete with dimensions and tolerance (component and system), drawings of products attached to a spinal model, photographs of the device, component name/part number of all components, written description of all components, description of how components interconnect, list of all instruments unique to the system (drawings or photographs), and identification of all device materials and list of standards to which the materials conform.

- Reports of Prior Clinical Investigations including:

  - Animal Data: Animal data are used to establish the relative safety of your total artificial disc prior to initiating human clinical studies including proof of concept, design concept, surgical instrumentation, surgical technique, failure mechanisms, device function, biological response, biocompatibility/toxicity.

  - Mechanical Data: characterization of the total artificial disc by preclinical mechanical testing including identification of all components tested, standards to which testing conform, test set-up, test procedure, evidence that testing constitutes worst case design, rationale for choice of loading modes, discussion of results in context of human clinical studies. The following specific studies are recommended:

    - Static and Dynamic Characterization

---

[30] 21 U.S.C. § 360j(g), Guidance for Industry and Food and Drug Administration Staff: IDEs for Early Feasibility Medical Device Clinical Studies , Including First in Human Studies

[31] Guidance for Industry and FDA Staff: Preparation and review of IDE applications for Total Artificial Discs

- Durability and Wear
- Subluxation and Expulsion
- Creep and Stress Relaxation
- Subsidence
- Kinematic Testing
- Device Migration
- Durability of Coatings

- Biocompatibility Data: depending on materials of construction, recommended testing may include polymer molecular weight, molecular weight distribution, percent crystallinity, degree of cross linking, leachables testing (e.g. the identification of residual monomers, solvents, catalysts, lubricants etc.)
- Shelf life data: evaluation of shelf life, sterilization and aging and evaluation of any impact on mechanical performance.

- In addition to these elements, the complete details of the proposed clinical study must be presented including:
  - Clinical Investigation Plan
    - Clinical Protocol and Study Design
    - Inclusion/Exclusion Criteria
    - Choice of Control
    - Number of Investigators, Sites and Subjects
    - Study Duration and Follow-up Schedule
    - Post-Operative Regimen
    - Safety and Effectiveness Endpoints
    - Subject Success
    - Study Success
    - Statistical Analysis and Data Presentation
    - Patient data report forms (Case report forms)
    - Risk Analysis
    - Retrieval Study
    - Spinal Tumors

         o   Monitoring Procedures

         o   Product labeling

   28. This information is reviewed and evaluated by FDA experts prior to granting the exemption which allows the clinical studies to begin. FDA recognizes the public health benefit of permitting clinical investigations of medical devices and strives to allow these investigations to proceed in a timely and efficient manner while ensuring that human subjects are adequately protected.[32]

### 3.4.2  PMA Non-Clinical Data for SECURE-C cervical artificial disc

   29.  The PMA submission for the SECURE-C cervical artificial disc was filed on September 17, 2010.[33] The non-clinical testing suite, including laboratory testing, packaging/shelf life validations, animal studies, biocompatibility, and sterilization validation included in the PMA submission for FDA review has been tabulated below (Table 1 and Table 2).[34] Additional studies in the PMA submission included:

- Sterilization validation conducted according to methods described in ANSI/AAMI/ISO 11137-2:2006 standards. Results confirmed that the sterility of the SECURE-C cervical artificial disc is maintained through the sterile barrier.[35]

- Shelf-life/packaging validation studies, including packaging and seal integrity, accelerated aging, and real-time aging tests were conducted. The results demonstrate that the packaging of the SECURE-C cervical artificial disc maintains a sterile barrier with a shelf life of five years.[36]

- Biocompatibility: The materials involved in the manufacture and construction of the SECURE-C cervical total artificial disc are considered standard for use in permanent orthopedic implants. These materials conform to the relevant standards which prescribe their formulation and testing.[37]

---

[32] Guidance for Sponsors, Clinical Investigators, Institutional Review Boards, and Food and Drug Administration Staff: FDA Decisions for IDE Clinical Investigations

[33] GM 003396 – GM 003401

[34] GM 003402 – GM 003451

[35] GM 003402 – GM 003451

[36] GM 003402 – GM 003451

[37] GM 003402 – GM 003451

**Table 1.    Summary of Non-Clinical Testing (Laboratory Testing) for SECURE-C Cervical Artificial Disc. [38]**

| Non-Clinical Test | Acceptance Criteria | Result |
|---|---|---|
| Static axial compression | Yield load must be greater than the maximum compressive load that a cervical intervertebral disc can withstand (75N). | The average 2% offset yield load was 1,677N ±129N, with an average displacement of 0.35mm ± 0.1mm. SECURE®-C can withstand compressive loading that exceeds the anticipated physiologic loads on the cervical spine. |
| Dynamic compression | Fatigue load must be greater than the maximum compressive load that a cervical intervertebral disc can withstand (75N). | Both specimens ran out to 10 million cycles under a 150N load. These results suggest that the SECURE®-C device can withstand dynamic compressive loading that exceeds the anticipated physiologic loads on the cervical spine. |
| Static compression shear | Given that the shear failure load of the cervical intervertebral disc is 20N, the yield load must be greater than the vertical component of shear loading, 28N. | The average 2% offset yield load was 494N ± 73N, with an average displacement of 0.93mm ± 0.22mm. These results suggest that the SECURE®-C can withstand compressive shear loading that exceeds the anticipated physiologic loads on the cervical spine. |
| Dynamic compression shear | Given that the shear failure load of the cervical intervertebral disc is 20N, the yield load must be greater than the vertical component of shear loading, 28N. | Both specimens ran out to 10million cycles under a 106N load. These results suggest that the SECURE®-C device can withstand dynamic compressive shear loading that exceeds the anticipated physiologic loads on the cervical spine. |
| Creep and stress relaxation | The average residual deformation must be less than the 1.5mm normal diurnal disc height change. | The average residual deformation following creep and stress relaxation was 0.195mm. These results suggest that the SECURE®-C device exhibits creep behavior that is less than normal anticipated physiologic conditions in the cervical spine. |
| Device pushout | Pushout load is greater than the shear failure load of the cervical intervertebral disc (20N). | The average pushout load was 289N ±101N. These results suggest that the SECURE®-C device can resist pushout forces that exceed the anticipated physiologic loads on the cervical spine. |

[38] GM 003402 – GM 003451

**Table 1 continued.    Summary of Non-Clinical Testing (Laboratory Testing) for SECURE-C Cervical Artificial Disc.** [39]

| Non-Clinical Test | Acceptance Criteria | Result |
|---|---|---|
| Core expulsion | Pushout load must be greater than the shear failure load of the cervical intervertebral disc (20N). | The average pushout load was 488N ± 27N. These results suggest that the SECURE®-C core can resist pushout forces that exceed the anticipated physiologic loads on the cervical spine. |
| Subsidence | Subsidence at twice the maximum compressive load that a cervical intervertebral disc can withstand (2x75N) should be less than the thickness of the endplate (minimum 0.65mm$^3$). | The average subsidence at 150N was 0.242mm ±0.156mm. These results suggest that the SECURE®-C device resists subsidence into the vertebral endplates. |
| Durability/wear testing | The amount of wear debris should be similar to that reported for other cervical devices (2.59 ±0.36 mg per million cycles). | The average weight loss over the 10 million cycles was 2.57 mg ±1.21 mg per million cycles for the original testing. For the second round of testing, the average weight loss was 0.89 mg ±0.3 mg per million cycles. These results suggest that the SECURE®-C device demonstrates wear rates similar to that of other cervical devices. |

**Table 2.    Summary of Non-Clinical Testing (Animal Testing) for SECURE-C Cervical Artificial Disc.** [40]

| Non-Clinical Test | Acceptance Criteria | Result |
|---|---|---|
| Particulate Debris Animal Study | There should be no evidence of neurotoxicity, systemic toxicity, or local effects associated with the UHMWPE particulate debris, based on histopathologic assessment. Irritant ranking scores < 2.9 indicate that the test material is a non-irritant. | There was no evidence of neurotoxicity, systemic toxicity, or local effects associated with the UHMWPE particulate debris for either the 3-month or 6-month animals. Microscopic evaluation of tissues surrounding the particles (muscle, vertebral segments, lymph nodes) and organs did not reveal any remaining wear debris or local or system lesions that could be attributed to wear debris. Both the low and high dose particulate spinal injections were determined to be non-irritants (Irritant ranking scores <2.9). |

[39] GM 003402 – GM 003451

[40] GM 003402 – GM 003451

1903299.000 9276

30. Ultra-high molecular weight polyethylene (UHMWPE) materials are used in many orthopedic medical devices (Class II and Class III) – as such, FDA has provided guidance to industry and its review staff regarding the characterization and testing of these materials.[41,42] Conventional UHMWPE originates from virgin resin powders or consolidated forms conforming to international consensus standard ASTM F648.[43]  Conventional UHMWPE is defined as "manufactured by compression molding or ram extrusion and [have] not been intentionally cross-linked before terminal sterilization."[44]  Material characteristics of conventional UHMWPE are expected to conform to the specifications of ASTM F648 for both powder and fabricated forms, and FDA recommends that the sponsor include a declaration of conformity to ASTM F648 (as appropriate) in premarket submissions. If the conventional UHMWPE material meets the specifications of ASTM F648, no additional information is typically required.[45]

### 3.4.3  PMA Clinical Data for SECURE-C: Overview

31. A clinical study was conducted in order to evaluate the safety and effectiveness of the SECURE-C cervical artificial disc (subject device) implanted at a single level within the cervical spine (C3-C7).[46] The study included 380 patients and featured 18 clinical sites. The subject device was compared to anterior cervical discectomy and spinal fusion (ACDF) in a prospective, multi-center, two-arm, randomized, unmasked, concurrently controlled, non-inferiority clinical study. The patient selection was based on a set of pre-defined inclusion and exclusion criteria:

---

[41] Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices

[42] GM 015561 – GM 15693

[43] Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices ; ASTM F648, Standard Specification for Ultra-High-Molecular-Weight Polyethylene Powder and Fabricated Form for Surgical Implants

[44] ASTM F2759, Standard Guidance for Assessment of the Ultra High Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic and Spinal Devices ; Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices

[45] Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices

[46] GM 003402 – GM 003451

**Inclusion Criteria:**

- Symptomatic cervical disc disease (SCDD) in one vertebral level between C3-C7, defined as neck or arm (radicular) pain, or functional or neurological deficit and radiographic confirmation (by CT, MRI, X-ray, etc.) of any of the following:
  - Herniated nucleus pulposus
  - Radiculopathy or myelopathy
  - Spondylosis
  - Loss of disc height
- Age between 18-60 years
- Failed at least 6 weeks of conservative treatment
- Neck disability index (NDI) questionnaire score of at least 30 (as percentage of 50-point total)
- Able to understand and sign informed consent
- Psychosocially, mentally, and physically able to fully comply with the clinical protocol including adherence to follow-up schedule
- Able to meet the follow-up schedule
- Able to follow the post-operative management program

**Exclusion Criteria:**

- More than one vertebral level requiring treatment
- Prior fusion surgery adjacent to vertebral level being treated
- Prior surgery at level to be treated
- Clinically compromised vertebral bodies at the affected level due to past or current trauma
- Radiographic confirmation of facet joint disease or degeneration
- Marked cervical instability on resting lateral or flexion/extension radiographs
- Severe spondylosis at the level to be treated
- Neck or arm pain of unknown etiology
- Osteoporosis, Paget's disease, osteomalacia or other metabolic bone disease
- Pregnant or could become pregnant

- Known allergy to titanium, polyethylene, cobalt, chromium or molybdenum
- Taking medication known to interfere with soft tissue healing
- Systemic disease including HIV, AIDS, Hepatitis
- Active malignancy
- Neuromuscular disorder
- Acute mental illness
- Use of bone growth stimulator within 30 days
- Participation in other investigational studies or drug trials within 30 days of surgery
- Prisoners

32. Patients were evaluated at 6 weeks, 3 months, 6 months, 12 months, 24 months, and annually after that time. Radiographic assessments were performed and adverse events (device-related and non-device-related) were monitored during the study. Adverse events were recorded at all visits whether scheduled or unscheduled. The adverse event categories include infection, pain, additional surgeries, and trauma, etc. In addition to the defined categories, Globus Medical evaluated the adverse events individually and presented related data and narrative details such as pain and secondary surgical interventions.

33. The publicly available summary of safety and effectiveness data (SSED) includes multiple tables describing adverse events that were observed during the study in the investigated populations (implanted with a SECURE-C versus an ACDF).[47] This document summarizes the percentage of patients experiencing device related adverse events in both the control group and the subject device. Device related adverse events – which have been identified as having etiology, temporal association, or cause, that is related to the device, such as: revision, removal, reoperation, or supplemental fixation at the index level, surgery at the index level to remove or alter the device, fracture or mechanical failure of device(s), pseudarthrosis, radiolucency around device(s), migration, subsidence, loosening, etc. It was reported that 2.5% of study participants with the subject device experienced a device related adverse event; while 9.7% of study

---

[47] GM 003402 – GM 003451

participants in the control group experienced a device related adverse event.[48] Neither core nor endplate displacement/migration was reported for any of the 380 patient participants in the clinical study.[49] These data from the clinical study were the basis for the clinical content of the PMA.

### 3.4.4  PMA Quality System (QS) Requirements

34. Pre-market approval applications are required to include a complete description of the methods, facilities, and quality controls, used in producing the medical device.[50] A sufficient level of detail is expected so FDA experts, within the CDRH Office of Compliance (OC), can review the QS information and make a knowledgeable assessment. This review is done concurrently to the Office of Device Evaluation (ODE) substantive reviews of the technical (laboratory and clinical) portions of a PMA application. This is unique to Class III medical device regulation and not required of lower risk i.e. Class I and Class II device manufacturers as part of the pre-market regulatory process.

35. The content of the QS components of a PMA submission includes submission of all Globus Medical's corporate procedures (SOPs) that govern elements of the design control process and the manufacturing process as stipulated in the quality system regulations. The required elements of the design control process and the associated regulations are compiled in Table 3.

---

[48] GM 003427

[49] GM 003441

[50] Guidance for Industry and FDA Staff: Quality System Information for Certain Premarket Application Reviews

**Table 3.   Required Quality Systems Content for PMA Submission.**[51]

| Content | Regulation | Description |
|---|---|---|
| Design controls | 21 CFR 820.30(a) | Overview of design controls including where in the development the device became subject to design controls |
| Design Inputs | 21 CFR 820.30(d) | Procedures that describe the identification and control of design inputs such as:<br>• Intended Use<br>• Clinical Needs<br>• Safety requirements<br>• Biocompatibility/Toxicology |
| Design Outputs | 21 CFR 820.30(c) | Procedures that define and document the measurable conformance to design inputs that are essential to proper functioning of the device |
| Design Review | 21 CFR 820.30(e) | Procedures that explain and govern how formal design reviews are held and detail at what stage of development |
| Design Verification | 21 CFR 820.30(f) | Procedures used to verify the device design meets all design requirements |
| Design Validation | 21 CFR 820.30(g) | Procedures used to validate the device design meets the intended user needs. Including clinical evaluations and risk management (documenting and updating risk analysis and management). |
| Design Transfer | 21 CFR 820.30(h) | Procedure to transfer the design output to manufacturing |
| Design Changes | 21 CFR 820.30(i) | Procedures for controlling design changes |
| Design History File | 21 CFR 820.30(j) | Procedures for maintaining the contents of the design history file. |

---

[51] Guidance for Industry and FDA Staff: Quality System Information for Certain Premarket Application Reviews

36. Similarly, the required elements of the manufacturing information and the associated regulations are compiled in Table 4.

**Table 4.    Required Manufacturing Content for PMA Submission.**[52]

| Content | Regulation | Description |
|---|---|---|
| Quality System Procedures | 21 CFR 820.20(e) | Copy of all quality systems procedures and quality manual including internal audit, management review, and outline of QS structure. |
| Purchasing controls | 21 CFR 820.50 | Procedures that describe supplier evaluation and control over suppliers, record maintenance and receiving acceptance of goods from suppliers |
| Production/Process Controls | 21 CFR 820.70 | Procedures for environmental and contamination controls during manufacture |
| Inspection, Measuring, Test Equipment | 21 CFR 820.72 | Procedures that explain how inspection, measuring and test equipment is calibrated, inspected, checked and maintained. |
| Process Validation | 21 CFR 820.75 | Copy of Validation Master Plan and a description of which processes are validated for the device vs. which are verified by inspection and test. |
| | 21 CFR 820.75(a) | Copy of the validation procedures for each process including: acceptance criteria, statistical methods, criteria for re-validation. |
| Receiving and Acceptance Activity | 21 CFR 820.80(b) | Procedures for incoming receipt/acceptance activity. Determination may be based on inspection and testing, supplier audit, vendor quality history, risk management etc. |
| Final Acceptance Activity | 21 CFR 820.80(d) | Procedures for final acceptance including lot release criteria, quarantine controls used, and assurance product will not be released until Device Master Record requirements are met and proper authorization occurs |

---

[52] Guidance for Industry and FDA Staff: Quality System Information for Certain Premarket Application Reviews

**Table 4 continued.    Required Manufacturing Content for PMA Submission.[53]**

| Content | Regulation | Description |
|---|---|---|
| Non-conforming product | 21 CFR 820.90 | Procedures for handling of non-conforming product such as identification, documentation, evaluation, segregation, disposition. Procedures describe relationship between non-conforming product, CAPA process, and document management responsibility. |
| Corrective and Preventive Action (CAPA) | 21 CFR 820.100 | Procedures for CAPA system and link to risk management. CAPA system should describe data inputs from quality system and how disposition decisions are made and documented by the proper responsible party. |
| Complaint Files | 21 CFR 820.198 | Procedures for handling of complaints and medical device reporting (MDR) including: criteria, investigations, coordination with non-conformance procedures, and coordination with CAPA procedures |

### 3.4.5  Pre-Approval Inspection

37. Another unique element of the Class III medical device regulatory evaluation process is the pre-approval inspection. In addition to the formal review of quality systems information, a PMA pre-approval inspection (PAI) is performed to assess a manufacturer's ability to design and manufacture the device in accordance with the conditions specified in the PMA and the requirements of the Quality System (QS) regulation. After the PMA Quality systems review is complete and the manufacturer has demonstrated to FDA that both the design controls and the manufacturing processes controls have been adequately established,[54] CDRH issues an inspection assignment for manufacturing sites. The pre-approval inspection assesses the systems, methods, and procedures for the specific PMA devices to ensure that the sponsor's quality management system is effectively established (defined, documented, and implemented)[55]. Pre-approval inspections are Level 2 Comprehensive Inspections that cover the

---

[53] Guidance for Industry and FDA Staff: Quality System Information for Certain Premarket Application Reviews

[54] FDA Compliance Program Guidance Manual: Medical Device Premarket Approval and Post Market Inspections Part II: Implementation

[55] FDA Compliance Program Guidance Manual Medical Device Premarket Approval and Post Market Inspections Part III: Inspectional

following four major subsystems: Management Controls, Design Controls, Corrective and Preventive Action (CAPA), and Production and Process Controls (P&PC).[56]

## 3.5  Post-Market Requirements

### 3.5.1  Post-Market Changes to Approved Class III Products

38. In contrast to lower risk (i.e. Class I and Class II medical devices), the FD&C Act requires that a PMA supplement be submitted for FDA review describing any change to an approved Class III device that affects safety or effectiveness.[57] Thus, a manufacturer may not make changes to an approved device without having the data to support the change reviewed, interrogated, and approved by FDA. The scope and breadth of changes to a product may include the approved indications, patient population, the approved design, or the approved manufacturing procedure/method of manufacturing for the device, etc.[58] These types of changes have been categorized by FDA and the type of submission required for each (and the contents) varies depending upon the scope and breadth. Table 5 details these categories and lists the type of PMA supplement required for each. It is important to note that under the regulations for a Class III device (listed in Table 5 for each category), changes to approved devices and associated elements of their manufacturing that meet these descriptions cannot be made and implemented without FDA approval.

39. In addition to seeking approval for post-market changes made to an approved device, Class III device manufacturers are required to submit annual reports. Annual reports contain a variety of information including summaries about minor/administrative changes that were made during the preceding year, a summary and bibliography of any newly published/unpublished relevant literature or clinical results concerning the device as well as information on devices

---

[56] FDA Compliance Program Guidance Manual, Medical Device Premarket Approval and Post Market Inspections Part III: Inspectional

[57] Guidance for Industry and FDA Staff: 30-day Notices, 135-Day PMA Supplements and 75-Day HDE Supplements for Manufacturing Method or Process Changes

[58] Guidance for Industry and FDA Staff: Modifications to Devices Subject to Premarket Approval (PMA) – The PMA Supplement Decision - Making Process

shipped/sold during the reporting period.[59] This information helps give the agency a picture of the post-market status, knowledge state, and safety profile of the device.

40. For all medical devices on the US market, FDA requirements stipulate that any adverse event associated with the device be reported to FDA.[60] For instances where a manufacturer becomes aware that their device may have caused or a death or serious injury – the regulations state that a sponsor must notify FDA within 30-days of receiving or becoming aware of the information. A sponsor is also responsible for conducting an investigation into each event and evaluating the cause and reporting this information to FDA.

---

[59] Guidance for Industry and Food and Drug Administration Staff: Annual Reports for Approved Premarket Approval Applications (PMA)

[60] 21 CFR 803.50

**Table 5.   Description of PMA Supplement Types and Regulations for Post-Approval Changes.**[61]

| PMA Supplement Type | Panel Track | 180-Day | Real-Time | Special CBE | 30-day Notice | Manufacturing Site Change |
|---|---|---|---|---|---|---|
| Description | A change in indication for use; major elements of design; and/or performance.<br><br>Substantial clinical data generally necessary to support the change | A significant change involving: principle of operation; control mechanism; design; or performance; labeling; and new testing or acceptance criteria.<br><br>Preclinical and in some instances confirmatory clinical data are needed to support the change. | Minor changes for which clinical data or FDA inspections are not needed.<br><br>Changes can be reviewed adequately by a reviewer in one scientific discipline; there is an FDA-accepted test method, standard, or an applicable guidance document. | If effectiveness is not altered, changes to add or strengthen information and/or manufacturing process elements that adds a new specification or test method providing additional assurance of the purity, identity, strength, or reliability of the device. | Changes in manufacturing that affect safety and effectiveness. | A move to a different manufacturing facility or establishment. |
| Regulation | Section 737(4)(B) of the Act (as modified by the Medical Devices Technical Corrections Act (MDTCA), Public Law 108-214) | Section 737(4)(C) of the Act | Section 737(4)(D) of the Act (and as modified by MDTCA) | Sections 21 CFR 814.39(d)(1) and 814.39(d)(2) | Section 515(d)(6)(A)(ii) of the Act; 21 CFR 814.39(f) | Section 21 CFR 814.39(a)(3) |

---

[61] Guidance for Industry and FDA Staff: Modifications to Devices Subject to Premarket Approval (PMA) – The PMA Supplement Decision - Making Process

### 3.5.2  Conditions of Approval

41. The SECURE-C cervical artificial total disc was granted PMA approval on September 28, 2012.[62] Conditions of approval included restrictions on the sale and distribution of the device to prescription use only, a five-year shelf life (as was demonstrated by data in the PMA submission), and the submission of general and specific PMA annual reports.[63] As described above, condition of approval for all Class III devices requires that no change can be made to the device or its manufacturing which impacts safety and efficacy without prior approval from FDA.[64]

42. Globus Medical was also required to conduct a post-approval study consisting of annual periodic evaluation of the 334 clinical study subjects from the initial approval study for seven years. The goal of this study was to further evaluate the longer-term safety and effectiveness of the SECURE-C cervical total artificial disc by reporting on a number of relevant clinical and patient parameters to quantify the overall success rate and longer-term safety profile for the device.[65]

43. A 10-year enhanced surveillance study of the SECURE-C cervical artificial total disc in order to fully characterize adverse events associated with the device and capture physician feedback was also required.[66]

### 3.5.3  Post-Approval Study and Adverse Events

44. On September 25, 2015, the three-year Interim Enhanced Surveillance Study Status Report was submitted to the FDA which detailed the progress of the post-approval study. This report included appendices which contain the completed survey forms, explant analyses, and referenced literature. Surveys were sent to 605 surgeons to inquire regarding overall results, surgical technique, adverse events, heterotopic ossification, patient satisfaction, and implant effectiveness. 149 surgeon responses with 61 surgeons reported using the product. A summary

---

[62] GM 003396 – GM 003401
[63] GM 003396 – GM 003401
[64]  GM 003396 – GM 003401
[65] GM 003396 – GM 003401
[66] GM 003396 – GM 003401

of the complaints and MDRs was also provided. During the reporting period, 16 complaints (coming from 10 events) related to the implant and 19 complaints related to the instrumentation were received. Explant analyses was conducted on returned devices and summarized with original documentation provided to the FDA as an appendix to the report. The number of devices sold/implanted since the PMA approval and a literature review for articles related to the subject device and other approved cervical disc replacements were provided. At the conclusion of the report, the following was stated "No significant changes to the design or manufacture of SECURE-C have been made. No significant CAPA activities or nonconformances related to SECURE-C implants or Class III instruments have occurred."[67]

    45. Since PMA approval, more than 4,755 Secure-C cores have been sold/implanted.[68] Only 14 complaints (including the subject case) relating to potential implant migrations have been reported.[69] Those complaints present different device, surgical, and patient factors. 12 of the remaining 13 complaints have device information available and none of these 12 complaints involve UHMWPE cores from the same lot as the subject device core.

---

[67] GM 014887 – GM 015269

[68] GM 016293

[69] GM 003862 – GM 003884; GM 003921 – GM 003944; GM 003945 – GM 003950; GM 004006 – GM 004039; GM 004046 – GM 004075; GM 004083 – GM 004113; GM 004121 – GM 004170; GM 004177 – GM 004217; GM 004218 – GM 004305; GM 004415 – GM 004432; GM 002817 – GM 002843; GM 002844 – GM 002871; GM 002934 – GM 002964; GM 002872 – GM 002933; GM 003282 – GM 003288; GM 004337 – GM 004379; GM 002965 – GM 003001; GM 003002 – GM 003015; GM 003016 – GM 003075; GM 003076 – GM 003112; GM 003113 – GM 003155; GM 003156 – GM 003208; GM 003209 – GM 003261; GM 003262 – GM 003273; GM 003447 – GM 003448; GM 016293

# 4  Analysis and Discussion

## 4.1  Opinion 1 – The FDA approval of the SECURE-C PMA, based on the totality of the data provided, affirms that the design and manufacturing of the SECURE-C cervical total artificial disc (core and endplates) are safe and efficacious for their intended use.

46. The SECURE-C cervical total artificial disc is a Class III medical device in the United States and as such requires pre-market approval (PMA). A pre-market application for the approval of a class III devices in the US must contain a comprehensive set of data and evidence that allow FDA to determine that the device, as manufactured, is safe and effective for its intended use and user population. The PMA review evaluates and interrogates all elements of the design, manufacturing, quality system, and testing of the device. PMA review is the most rigorous evaluation possible by FDA experts and requires that comprehensive evidence demonstrate that the design and manufacturing processes of the device result in a safe and effective product for its intended use and target patient population. The Secure-C PMA included non-clinical scientific laboratory studies, the results of clinical investigations, and a complete description of Globus Medical's quality systems and the manufacturing that produces the device process (including validation data). The FDA approval of the SECURE-C PMA affirmed that the design and manufacturing of SECURE-C are safe and efficacious based on the totality of data provided.

47.  Prior to even accepting (or filing) a PMA application and beginning the substantive review, FDA assures that all the expected and required content is present in the submission and is in suitable form. During the substantive review, FDA subject matter experts thoroughly evaluate and interrogate all the data/evidence, ask questions when necessary, and gather the complete picture of information leading to a knowledgeable science-based decision regarding safety and effectiveness.

48. With respect to non-clinical studies, the approval of the application affirms that the submitted data met FDA expectations and industry standards for mechanical performance, wear testing, simulated use testing, packaging/shelf life validations, animal studies/biocompatibility analysis, etc. Clinical study results, success metrics, adverse events, patient satisfaction etc. are

also evaluated by FDA clinical/medical experts during substantive PMA review. Prior to even beginning a clinical study in the US, an IDE must be granted by FDA where a determination is made regarding the safety of the study patients based on scientific data and evidence. Specific to the SECURE-C cervical total artificial disc, Globus Medical received IDE approval which speaks to the fact that the FDA believed an appropriate level of evidence to support the safety of study patients was provided. Within the PMA substantive review, FDA evaluated all the clinical study information and results. The approval of the PMA affirms that the results of the clinical study met FDA expectations and industry standards for demonstrating the clinical safety, effectiveness, and viability for total artificial discs.

49. The PMA application for the SECURE-C cervical total artificial disc, manufactured as described in the PMA and governed by Globus Medical's quality management system, was approved on September 28, 2012. This approval affirms that the complete, comprehensive picture of the product - its physical characterization, laboratory data to assess performance, its clinical results and known adverse events, all met the requirements set forth by the FDA for safety and effectiveness in the target population. For a Class III medical device in the US market, this review, evaluation, and risk/benefit decision process is generally considered the most rigorous and robust in the world.

50. It is my opinion that, based on the evidence presented above, there is no basis for the opinions of Dr. Jarrell (#2, #3, #4) which suggest that the device was improperly designed, and manufactured for its intended purpose, and that the subject device lacked the necessary physical characteristics to properly function.[70] Additional support for these rebuttals has been included below.

---

[70] Report of John D. Jarrell, PhD, PE, dated May 2, 2019

**4.2 Opinion 2 – The PMA approval affirms that the manufacturing process to produce the SECURE-C cervical total artificial disc and the quality control framework in which the device components (core and endplates) are manufactured met the most rigorous FDA requirements. As Globus Medical met these requirements in the manufacturing of the subject SECURE-C (core and endplates) - there is no basis to support any opinion that: the subject device (core and endplates) was defectively manufactured, the production of the subject device yielded defective and undetected product that would pose a significant risk to patient safety, or that the manufacturing process and quality management system that governs that process are deficient.**

    51. A PMA submission must contain all information regarding the methods, facilities, and quality controls, used in producing a medical device including those sufficient to establish that a sponsor complies with the quality systems regulations.[71] Similar to the manner in which a substantive review evaluates and interrogates the non-clinical and clinical data, FDA experts from the Office of Compliance perform a substantive review of the quality systems and manufacturing information including validation activities for this process. Globus Medical, within their PMA application for the SECURE-C cervical total artificial disc, included all such information in the form of both descriptive summaries and company SOPs (as is required).[72] Descriptions and all SOPS that govern the QMS elements detailed above (Table 4 and Table 5) were submitted in the PMA, including the following specific elements pertinent to this matter: each step of the manufacturing process, process qualifications, required inspections, statistical sampling for testing and inspection, process validations (protocol and reports) of manufacturing etc.[73]

    52. This information was evaluated and interrogated by FDA quality systems compliance experts. The PMA approval affirms that the manufacturing process to produce the device and

---

[71] Guidance for Industry and Food and Drug Administration Staff: Quality Systems Information for Certain Premarket Application Reviews

[72] GM 015561 – GM 0015693

[73] GM 015561 – GM 0015693

the quality control framework in which the device is manufactured meets all the FDA requirements for compliance to quality systems regulation.

53. In addition, after completion of this review (prior to approval), a pre-approval inspection (PAI) occurred to assure the quality management system is effectively established (defined, documented, and implemented) by Globus Medical.[74] The PMA approval affirmed that Globus Medical successfully passed the PAI audit.

54. With respect to the manufacturing of the SECURE-C cervical total artificial disc core (including the core of the subject device), the material of construction – conventional UHMWPE, the raw material was certified to international standard (ASTM F648). This information was provided in the PMA submission and reviewed/analyzed/approved by FDA.[75] Manufacturing of SECURE-C cervical total artificial discs is conducted per the validated and FDA approved manufacturing processes and is governed by an FDA approved/inspected quality system framework.

55. With respect to the subject device, the process of manufacturing the UHMWPE core shows the expected level of traceability, documentation and quality control measures expected for a Class III device. Globus Medical took appropriate measures to assure the quality of: sourcing incoming materials of construction, the manufacturing of device components, and the production of finished product devices from these components. The UHMWPE raw material powder (Batch No. 0000493126) was provided by Ticona and certified on June 22, 2011 to meet both the ASTM F648 standard and ISO 5834-1.[76]

56. Subsequent processing of the raw material into UHMWPE rod was conducted by Orthoplastics (incoming powder as Lot No. 0000493126, rod with Batch No. 1944M). The test certificate provided by Orthoplastics on May 24, 2012 indicated that the material met all of the UHMWPE property requirements (i.e. density, morphology index, tensile stress at yield, etc.).[77]

---

[74] Food and Drug Administration Compliance Program Guidance Manual, Medical Device PMA Preapproval Approval and PMA Postmarket Inspections Part III: Inspectional

[75] GM 015561 – GM 0015693

[76] GM 000031-000039, see GM 000039

[77] GM 000031-000039, see GM 000038

57. From this rod, Eptam Plastics machined 69 SECURE-C cores for work order #150077-003 (per Globus' PO # GM-PO-256067).[78] Eptam's work order concurs with the material lot/batch numbers identified previously from raw material supplier Ticona and rod manufacturer Orthoplastics (493126 and 1944M).[79] The work order confirms that 69 pieces were machined on June 29, 2012 with a final inspection occurring on July 2, 2012.[80] The first article inspection documented on June 29, 2012 provides confirmation of 35 characteristics that were measured and/or visually inspected.[81]

58. According to Globus Medical manufacturing records, 69 SECURE-C cores (11x12, 8 mm, Part No. 414.108) arrived at Globus Medical on July 10, 2012 and were designated to be Lot # EMN131JE.[82] Eptam's Certificate of Compliance indicated that Lot# EMN131JE was machined according to drawing 414.107 Rev. E.[83] Part of the acceptance of the cores received from Eptam included inspection of 13 cores – the number required to achieve an acceptance quality limit (AQL) level of 1.0.[84] (Importantly, the number of units inspected to achieve the desired AQL can be traced to the Globus Medical statistical sampling plan – which was submitted to FDA as part of the PMA and evaluated by FDA experts for appropriateness.[85]) On July 16, 2012, three dimensions (1- Height; 2-Medial - Lateral; 3- Anterior-Posterior) were verified on 13 cores that were inspected and all met the requirements.[86, 87] All 69 cores in the lot were accepted and released on July 16, 2012.[88]

59. Beginning on August 9, 2012, the SECURE-C cores underwent operations including component cleaning, oven drying, packaging, and various inspections pre- and post-

---

[78] GM 000173-000186, see GM 000173

[79] GM 000173-000186, see GM 000173

[80] GM 000173-000186, see GM 000173-000174

[81] GM 000173-000186, see GM 000176-000179

[82] GM 000031-000039, see GM 000031

[83] GM 000031-000039, see GM 000037; GM 000030

[84] GM 000031-000039, see GM 000032

[85] GM 0015561 – GM 0015693

[86] GM 000031-000039, see GM 000032

[87] GM 000031-000039, see GM 000031, see GM 000034

[88] GM 000031-000039, see GM 000031, see GM 000034

sterilization.[89] The oven drying operation performed at 50°C for 19 hours was within the validated temperature/time range (55 +/- 5°C ; 4-24 hours).[90] The packaging of the UHMWPE cores is in double foil pouches.[91] The packaged cores underwent gamma sterilization at Sterigenics on August 18, 2012 with a target dose of 25.0 - 40.0 kGy (actual 28.7 - 32.5 kGy).[92] Prior to shipping the pouches for sterilization, 100% visual inspection and peel strength of the pouches was conducted.[93] Sixty-nine (69) units were transferred to controlled inventory on October 1, 2012 following the close-out inspection.[94]

60. Based on this evidence, there is no basis to support any opinion that the production of the SECURE-C core (including the subject Secure-C core) yielded an undetected and defectively manufactured product that would pose a significant risk to patient safety. In addition, there is no basis to support any opinion that the manufacturing process and the quality management systems framework that governs that process are in any way deficient. These validated processes and procedures are FDA approved and any change to elements of this activity or procedures must be assessed for regulatory impact and subsequently reviewed and approved via the appropriate applicable post-market regulatory pathway.

61. With respect to the inferior endplate of the subject device – Carpenter Technology Corporation produced the CoCr materials according to ASTM F799-11 (chemistry only) and ASTM F1537 (Alloy 1 Warm Worked).[95] The rod stock material was then distributed by Titanium Industries to DRT Medical.[96] Titanium Industries and Carpenter provided Certificates of Analysis for the material.[97] DRT Medical role is machined the raw material is cut into ¾-inch diameter by 8-inch long pieces.[98] The pieces are then machined, grinded, polished, and

---

[89] GM000040; GM 0000187-0000210, see GM000191 ; GM 0000187-0000210, see GM 0000192-195

[90] GM015534 – GM015560

[91] GM000119

[92] GM 0000187-0000210, see GM000208

[93] GM 0000187-0000210, see GM000193-GM000194

[94] GM 0000187-0000210, see GM 0000195

[95] GM 000168 – GM 000170

[96] GM 000167

[97] GM 000167 – GM 000170

[98] GM 000121

ultrasonically cleaned (between July 15, 2014 and July 22, 2014).[99] DRT Medical, LLC's routing sheet for the machining step notes that "all radii and transitions to be blended smoothly to each other. No digs or mis-matches allowed."[100] It should also be noted that the routing sheets (for various steps of the process) for DRT Medical are marked with the following statement: "This is a surgical implant and must conform 100% to the part print. No deviation allowed."[101]

62. Tipp Machine & Tool, Inc. (a subsidiary of DRT Holdings, Inc.) performed a first piece and in-process inspection on July 16, 2014 and July 18, 2014.[102] All samples evaluated passed the dimensional inspections. After polishing, the endplates are inspected for conformity to part print, and inspected (100%) for gross debris. The components are then titanium plasma sprayed by APS-Materials, Inc. per specification PDA37-004.[103] After titanium plasma spray, the components are inspected for conformity to part print and all certifications are verified.[104] The components are then passivated and laser marked (August 19, 2014 and August 20, 2014).[105] On August 29, 2014, 4 inferior endplates were rejected due to a portion of the laser marking on the radius of the part.[106] The laser marking was removed and the parts were passivated, remarked, and ultrasonically cleaned. The inferior endplates (part 714.113) were shipped to Globus Medical. On September 11, 2014, Globus Medical verified the material certifications and certificates of compliance for the 18 inferior endplates sent from DRT Medical.[107] The parts were inspected for "excessive scratches, burrs, cracks, rough or sharp edges, loose or embedded foreign material, discoloration, irregular surfaces, pitting.[108] Thirteen of the 18 endplates were dimensionally inspected.[109] This sample size can be traced to the Globus Medical statistical sampling plan – which was submitted to FDA as part of the PMA and evaluated by FDA experts

---

[99] GM 000139 – GM 000162

[100] GM 000122

[101] GM 000120 – GM 000134

[102] GM 000139 – GM 000162

[103] GM 000166

[104] GM 000127

[105] GM 000128

[106] GM 000137 -138

[107] GM 000003

[108] GM 000003

[109] GM 000003

for appropriateness.[110] The cleaning, packaging, and sterilization took place for 18 inferior endplates in Lot GBR266BH between September 23, 2014 and October 7, 2014, according to Globus Manufacturing Traveler for the endplates.[111] There were no deviations in the cleaning, packaging, and sterilization procedures, which are explained in SECURE-C Endplate Manufacturing Procedure (MP.005).[112] The product was transferred to finished inventory on October 9, 2014.

63. Based on this evidence, there is no basis to support any opinion that the production of the SECURE-C inferior endplates (including the subject Secure-C inferior endplates) yielded an undetected and defectively manufactured product that would pose a significant risk to patient safety. In addition, there is no basis to support any opinion that the manufacturing process and the quality management systems framework that governs that process are in any way deficient. These validated processes and inspection procedures are FDA approved and any change to elements of this activity or procedures must be assessed for regulatory impact and subsequently reviewed and approved via the appropriate applicable post-market regulatory pathway.

64. For these reasons, and those discussed below, it is my opinion that there is no basis to support the opinions of Dr. Jarrell (#2, #3, #4, #5, #6) which allege that the subject device core and inferior endplates were defectively manufactured and that undetected product was outside of specification.[113] In addition, the evidence presented above indicates that there is no basis to support the opinions of Dr. Dunn, who also alleges an improperly and defectively manufactured product (#7, #8, #9, #20), inadequate inspection techniques (#6, #12, #14, #19), and ineffective quality systems (#17, #18, #21).[114]  Additional support for these rebuttals has been included below.

---

[110] GM 0015561 – GM 0015693

[111] GM 000320 – GM 000339

[112] GM 00090 – GM 000100

[113] Report of John D. Jarrell, PhD, PE, dated May 2, 2019

[114] Report of Russell F. Dunn, PhD, PE, dated May 2, 2019

## 4.3  Opinion 3 – It is critical to consider that the performance of medical devices is multifactorial and includes numerous device, surgical, and patient factors. The clinical study data and post-market safety data relating to potential core migrations of the SECURE-C cervical total artificial disc do not support any opinion that the subject device was defectively manufactured or that the manufacturing process produces undetected and defective products.

65. The performance of any implantable medical device in the human body and the associated risks and benefits of any device are a function of a numerous device, patient, and surgical related factors. The interaction of these may impact the performance of a medical device in a specific context and the extent of that impact is largely unpredictable. Patient-related factors may include the uniqueness of human anatomy, the diversity of patients within a population, as well as the uniqueness (severity, impact to quality of life, etc.) of a given disease state. Surgical related factors, mainly related to the execution of various techniques, also can impact the performance of medical devices by way of risks and benefits – potentially introducing new risks or benefits.  In this context, a surgical technique guide is submitted as part of the PMA package which is interrogated and approved by FDA medical officers.  This guide sets forth the recommended techniques and instruction to be used during the surgical procedure associated with implanting the device – nonetheless, FDA does not regulate the practice of medicine.

66. As part of the risk-benefit determination for a medical device, the FDA and the manufacturers must consider the entire spectrum of these factors in both the pre-market and post-market setting.[115] With respect to the risks/harms associated with any medical device, the severity, probability, and duration of any harmful event (including both severe or moderate adverse events) is considered as part of the risk management process. With respect to benefits of using a device to treat disease, these factors may include: type and magnitude of benefit, probability of a patient experiencing benefit, and duration of these effects, impact on quality of

---

[115] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider Regarding Benefit-Risk in Medical Device Product Availability, Compliance, and Enforcement Decisions ; Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider When Making Benefit-Risk Determinations in Medical Device Pre-Market Approval and de novo Classifications

life/patient function/ etc. Importantly, with respect to both risks and benefits – the uniqueness and diversity of patients and diseases play a role. FDA publishes a summary of all the risks and benefits for the device to the general public in the device specific SSED that outlines the conditions of approval, results of testing, relevant surgical techniques, and indications/contraindications for the device.[116]

67. FDA and manufacturers consider relevant and reliable evidence and data available to ensure that informed, science-based decisions are made. When faced with a severe or chronic disease, one patient may highly value the benefit provided by a medical device in light of their specific conditions. Patients with less severe or chronic diseases may or may not place the same value on a device. It should be noted that all devices have some level of anticipated risk, even without any device nonconformities or regulatory non-compliances. Similarly, hazards and hazardous situations can occur when a device functions normally as per its design for its intended use and user population.[117] As such – there is never 100% certainty in the process of assessing the safety and effectiveness of a device for every patient and every permutation of a disease; nor is any healthcare process or procedure risk free.

68. Since PMA approval, more than 4,755 Secure-C cores have been sold/implanted.[118] Only 14 complaints (including the subject case) relating to potential implant migrations have been reported.[119] Those complaints present different device, surgical, and patient factors. 12 of the remaining 13 complaints have device information available and none of these 12 complaints involve UHMWPE cores from the same lot as the subject device core. As FDA was aware of these adverse events, the lack of post market action (such as mandatory product recalls, warning

---

[116] GM 003447 – GM 003448

[117] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider Regarding Benefit-Risk in Medical Device Product Availability, Compliance, and Enforcement Decisions ; Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider When Making Benefit-Risk Determinations in Medical Device Pre-Market Approval and de novo Classifications

[118] GM 016293

[119] GM 003862 – GM 003884; GM 003921 – GM 003944; GM 003945 – GM 003950; GM 004006 – GM 004039; GM 004046 – GM 004075; GM 004083 – GM 004113; GM 004121 – GM 004170; GM 004177 – GM 004217; GM 004218 – GM 004305; GM 004415 – GM 004432; GM 002817 – GM 002843; GM 002844 – GM 002871; GM 002934 – GM 002964; GM 002872 – GM 002933; GM 003282 – GM 003288; GM 004337 – GM 004379; GM 002965 – GM 003001; GM 003002 – GM 003015; GM 003016 – GM 003075; GM 003076 – GM 003112; GM 003113 – GM 003155; GM 003156 – GM 003208; GM 003209 – GM 003261; GM 003262 – GM 003273; GM 003447 – GM 003448; GM 016293

letters, enforcement action, etc.) indicates that these data are not sufficient to constitute a safety signal commensurate with an inappropriate risk-benefit balance.[120]

69. For these reasons, and further reasons discussed below, it is my opinion that the evidence presented above demonstrates that there is no basis to support the opinions or Dr. Jarrell (#1, #2, #3, #4, #5, #6 #7) [121] and Dr. Dunn (#8, #16, #22),[122] which imply that the subject device failed entirely because of an defectively  manufactured product that presented unacceptable risk and unforeseen harm.

70. Additionally, the post-market safety data of the SECURE-C cervical total artificial disc (in particular the reported incidence of migrations relative to the number of units tested in clinical studies and distributed in the marketplace) provide further support that the SECURE-C is neither deficiently designed nor was the subject core and endplates defectively manufactured.[123] Additional support for these rebuttals has been included below.

---

[120] Guidance for Industry and Food and Drug Administration Staff:  Factors to Consider Regarding Benefit-Risk in Medical Device Product Availability, Compliance, and Enforcement Decisions

[121] Report of John D. Jarrell, PhD, PE, dated May 2, 2019

[122] Report of Russell F. Dunn, PhD, PE, dated May 2, 2019

[123]GM 003862 – GM 003884; GM 003921 – GM 003944; GM 003945 – GM 003950; GM 004006 – GM 004039; GM 004046 – GM 004075; GM 004083 – GM 004113; GM 004121 – GM 004170; GM 004177 – GM 004217; GM 004218 – GM 004305; GM 004415 – GM 004432; GM 002817 – GM 002843; GM 002844 – GM 002871; GM 002934 – GM 002964; GM 002872 – GM 002933; GM 003282 – GM 003288; GM 004337 – GM 004379; GM 002965 – GM 003001; GM 003002 – GM 003015; GM 003016 – GM 003075; GM 003076 – GM 003112; GM 003113 – GM 003155; GM 003156 – GM 003208; GM 003209 – GM 003261; GM 003262 – GM 003273; GM 003447 – GM 003448; GM 016293

# 5   Rebuttal of Plaintiffs' Expert Reports

## 5.1  Report of Russell F. Dunn, Ph.D., P.E.

71. Dr. Dunn's report offers opinions, which criticize the Globus Medical quality management system and manufacturing process. Dr. Dunn, alleges the following:[124]

- an improperly and defectively manufactured product
    - Opinion 4 – The subject SECURE-C core is made from Ticona GUR 1020 UHMWPE that has no antioxidant present in its formulation.
    - Opinion 7 – Deformation of the subject SECURE-C core superior side most likely occurred during machining of the final component.
    - Opinion 8 – Oxidative degradation combined with poor manufacturing processes most likely contributed to the failure of the SECURE-C core.
    - Opinion 9 – The subject SECURE-C core most likely experienced oxidative degradation during the manufacturing process.
    - Opinion 20 – The subject SECURE-C core was improperly manufactured and produced.
- inadequate inspection techniques
    - Opinion 6 – No testing of the SECURE-C core for oxidative degradation, using FTIR spectroscopy, occurs after the air-drying operation.
    - Opinion 12 – Only a small portion (sample testing) of the SECURE-C are visually and dimensionally inspected prior to implantation.
    - Opinion 14 – SECURE-C cores are not individually evaluated for surface roughness before implantation.
    - Opinion 19 – Surface roughness of the SECURE-C core should be evaluated for each component prior to device distribution.
- ineffective quality systems
    - Opinion 17 - The severity associated with oxidative degradation of SECURE-C cores should have resulted in process and testing safeguards to

---

[124] Report of Russell F. Dunn, PhD, PE, dated May 2, 2019

minimize or eliminate this potential failure mode. Example of safeguards include, but are not limited to, FTIR testing of the SECURE-C core prior at key points in the manufacturing process and drying of the core in an inert nitrogen environment in the manufacture of SECURE-C cores.

- o Opinion 18 – The severity associated with either oxidative degradation of a subject SECURE-C core or poor surface morphology after machining should have led to 100% inspection of SECURE-C cores prior to distribution.

- o Opinion 21 – The severity associated with an improperly manufactured core should have resulted in process safeguards to minimize or eliminate failure modes attributed to manufacturing deficiencies.

72. As stated and discussed above regarding the subject SECURE-C UHMWPE core, according to Globus Medical manufacturing records 69 SECURE-C cores arrived at Globus Medical on July 10, 2012 and were designated as Lot # EMN131JE.[125] Eptam's Certificate of Compliance indicated that Lot# EMN131JE was machined according to drawing 414.107 Rev. E. [126] Part of the acceptance of the cores included inspection of 13 cores – the number required to achieve an acceptance quality limit (AQL) level of 1.0.[127] (Importantly, the number of units inspected to achieve the desired AQL can be traced to Globus Medical's statistical sampling plan – which was submitted to FDA as part of the PMA and evaluated by FDA experts for appropriateness.[128]) On July 16, 2012, three dimensions (1- Height; 2-Medial - Lateral; 3- Anterior-Posterior) were verified on 13 cores that were inspected and all met the requirements.[129, 130] All 69 cores in the lot were accepted and released on July 16, 2012.[131] It is important to note that the oven drying operation performed at 50ºC for 19 hours was within the validated temperature/time range (55 +/- 5ºC ; 4-24 hours).[132] This data was submitted to FDA, reviewed by experts, and subsequently approved.

---

[125] GM 000031-000039, see GM 000031

[126] GM 000031-000039, see GM 000037; GM 000030

[127] GM 000031-000039, see GM 000032

[128] GM 0015561 – GM 0015693

[129] GM 000031-000039, see GM 000032

[130] GM 000031-000039, see GM 000031, see GM 000034

[131] GM 000031-000039, see GM 000031, see GM 000034

[132] GM015534 – GM015560

73. As stated above quality management system and manufacturing process elements of a PMA device require FDA review and inspection prior to approval. In this case, the design, the validated manufacturing process and QMS information were reviewed, inspected and subsequently approved by the FDA. Dr. Dunn's attempt to discredit the manufacturing process and impart changes to the quality management system and in-process testing/inspection procedures is not aligned with and disregards the FDA regulatory process. The manufacturing process, including all testing, measurements and inspections conducted during that process, are mandated by the FDA PMA approval and cannot be altered or changed in the post-market setting without FDA approval.[133] The FDA specifically approved the device in which the UHMWPE material, GUR 1020, conforms to the ASTM standard F648 describing the type and timing of testing for the polyethylene. The Manufacturing Process and Product Validation Protocol and Report and Process Validation Protocol and Reports were submitted to and approved by the FDA.[134] Those validations specifically included every step of the manufacturing process and detailed the testing and inspections that would occur during each step of the process. Those validations specifically included oven drying of the core at 4-24 hours at 55ºC.

74. My discussion of Dr. Dunn's main opinions and the bases for my rebuttal to those opinions are addressed above and further described below. Dr. Dunn opines that:

- Opinion 16 - there is no evidence of a formal safety analysis of the Secure-C, such as a Failure Mode and Effects Analysis ("FMEA") recommended by ISO 14971, of the core design (dFMEA) and/or manufacturing process (pFMEA).

75.  I disagree with this opinion. As part of the PMA application process, Globus would have performed risk assessments, hazard/harm analysis, and evidence that mitigations are sufficient to reduce risk relevant to the SECURE-C as low as is practicable per the requirements if international standard ISO 14971 – application of risk management to medical devices.[135] The FDA's consideration of the preclinical and clinical data to determine if there was a reasonable

---

[133] Guidance for Industry and FDA Staff: 30-day Notices, 135-Day PMA Supplements and 75-Day HDE Supplements for Manufacturing Method or Process Changes; Guidance for Industry and FDA Staff: Modifications to Devices Subject to Premarket Approval (PMA) – The PMA Supplement Decision - Making Process

[134] GM 0015270 – GM 0015693

[135] GM 015569

assurance of safety and effectiveness of the SECURE-C necessarily includes a comprehensive analysis of these risks and mitigations, as well as the context of benefits to patients receiving the product. The SECURE-C PMA application included information on the preclinical studies and testing as well as clinical data which was reviewed, interrogated, and approved. In addition, the publicly available SECURE-C's Summary of Safety and Effectiveness Data specifically sets forth a comprehensive summary of the preclinical studies performed which included laboratory, animal and additional studies and identifies the test name, the purpose, the method, the acceptance criteria and the results. This document also clearly sets forth the potential risks and benefits associated with the device. The FDA approval of the PMA affirms that the risk-benefit balance is appropriate for the SECURE-C device and that the device is safe and effective for its intended use and user population.

76. Dr. Dunn has several opinions regarding oxidation of UHMWPE and suggests characterization testing should be performed during manufacture (opinions #8, #9, #17) and that antioxidants should be used (opinion #4). I disagree with these opinions. Ultra-high molecular weight polyethylene (UHMWPE) materials are used in many orthopedic medical devices (Class II and Class III) – as such, FDA has provided guidance to industry and its review staff regarding the characterization and testing of these materials.[136] Material characteristics of conventional UHMWPE are expected to conform to the specifications of ASTM F648 for both powder and fabricated forms, and FDA recommends that sponsors include a declaration of conformity to ASTM F648 (as appropriate) in premarket submissions. If the conventional UHMWPE material meets the specifications of ASTM F648, no additional information is typically required.[137] With respect to the subject device, the design was specified to include GUR 1020 UHMWPE material that meets the ASTM F648 standard. Globus Medical submitted the appropriate declaration to the ASTM F648 standard and FDA specifically approved the SECURE-C product and, consequently, the UHMWPE used in the construction of the SECURE-C core.[138]

---

[136] Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices ; GM 015561 – GM 15693

[137] Guidance for Industry and Food and Drug Administration Staff: Characterization of Ultrahigh Molecular Weight Polyethylene (UHMWPE) Used in Orthopedic Devices

[138] GM 015569 ; GM 015591

## 5.2  Report of John D. Jarrell, Ph.D., P.E.

77. Similar to Dr. Dunn, Dr. Jarrell offers opinions which criticize the Globus Medical quality management system and manufacturing process, which was validated and subsequently reviewed and approved by the FDA during the PMA process.[139] Like Dr. Dunn, he also disregards the FDA regulatory process. As noted above, the manufacturing process including all testing, measurements, and inspections conducted during that process, are mandated by the FDA PMA approval and cannot be altered or changed in the post-market setting without FDA concurrence or approval as necessary.

78. My discussion of Dr. Jarrell's main opinions and the bases for my rebuttal to those opinions are addressed above and further described below.

- Opinion 2 – The SECURE-C failure was caused by the devices defective condition and Globus' improper manufacture.

- Opinion 3 – The defect in the plaintiff's SECURE-C cervical artificial disc caused the product to lack adequate strength and stability for its designed and intended purpose

- Opinion 4 – I have considered reasonable alternative explanations for the failure of the SECURE-C cervical artificial disc in this case and have concluded that the device's defective condition and Globus' improper production and distribution of the device is the most likely cause of the failure

- Opinion 5 – The SECURE-C device was defectively manufactured and improperly produced due to a manufacturing defect that was present in the device's polyethylene core.

- Opinion 6 – I have considered alternative explanations for the dimensional defect and the visual deformities with the "spherical curvature" of the core and have concluded that the product was defectively manufactured and improperly produced. The core was most likely out of design specification at the time the SECURE-C device was manufactured and produced.

79. I disagree with these opinions. The manufacturing records for the subject SECURE-C indicate that the subject core and endplates were manufactured and inspected in compliance

---

[139] Report of John D. Jarrell, PhD, PE, dated May 2, 2019

with the specifications specifically validated by Globus Medical and reviewed and approved by the FDA during the PMA process. Specifically, the number of units inspected to achieve the desired AQL can be traced to the Globus Medical statistical sampling plan – which was submitted to FDA as part of the PMA and evaluated by FDA experts for appropriateness.[140] In addition, Dr. Jarrell has not specified what defect existed in the core manufacturing processes, nor does he identify the subject core manufacturing defect. In addition, he offers no explanation regarding how and when the manufacturing defect occurred during the manufacturing process. He offers no explanation for how a single core in a lot of 69 cores could have sustained a manufacturing defect while the others did not.

80. Finally, Dr. Jarrell does not explain why the thousands of other cores manufactured before and after the subject core (which involved the same manufacturing process and quality control framework) did not sustain the same manufacturing defect, resulting in high numbers of core migrations in the marketplace. In this context, Dr. Jarrell implies that the other complaints which relate to potential core migrations support his opinions that the subject core was defectively manufactured and the manufacturing process is somehow deficient and resulted in a defective product. The complaint files do not support those opinions. The post-market safety data of the SECURE-C cervical total artificial disc (particularly the reported incidence of migrations relative to the number of units tested in clinical studies and distributed in the marketplace) provide further support that the SECURE-C was neither deficiently designed nor was the subject SECURE-C core defectively manufactured.

---

[140] GM 0015561 – GM 0015693

# 6  Summary of Opinions

81. Based on the information available to me and my education, training and background, I conclude within a reasonable degree of scientific certainty that:

- Opinion 1 – The FDA approval of the SECURE-C PMA, based on the totality of data provided, affirms that the design and manufacturing of SECURE-C cervical total artificial disc (core and endplates) are safe and efficacious for their intended use.

- Opinion 2 – The PMA approval affirms that the manufacturing process to produce the SECURE-C cervical total artificial disc and the quality control framework in which the device is manufactured met the most rigorous FDA requirements. As Globus Medical met these requirements in manufacturing the subject SECURE-C (core and endplates) - there is no basis to support any opinion that: the subject device (core and endplates) was defectively manufactured, the production of the subject device yielded defective and undetected product that would pose a significant risk to patient safety, or that the manufacturing process and the quality management system that governs that process are in any way deficient.

- Opinion 3 – It is critical to consider that the performance of medical devices is multifactorial and includes numerous device, surgical, and patient factors. The clinical study data and post-market safety data relating to potential core migrations of the SECURE-C cervical total artificial disc do not support any opinion that the subject device was defectively manufactured or that the manufacturing process produces undetected and defective products.

82. This report summarizes the results of my document review and analysis related to the subject matter. My findings are based on my education, training and experience as well as information presently provided. As discovery progresses, my findings may be updated if new information becomes available. I reserve the right to respond to additional opinions provided by plaintiffs' experts and to information that is provided as discovery proceeds and to supplement this report if necessary. I also intend to prepare exhibits for trial based on the information presented in this report and on the documents that I have referenced throughout as necessary.

Nicholas M. Benetatos, Ph.D.

## Appendix A

## CV of Nicholas Benetatos, Ph.D.



# $Ex$ponent®
### Engineering & Scientific Consulting

## Nicholas Benetatos, Ph.D.,

Manager | Biomedical Engineering
3440 Market Street, Suite 600 | Philadelphia, PA 19104
(215) 594-8933 tel | nbenetatos@exponent.com

## Professional Profile

Dr. Nicholas Benetatos brings a wealth of knowledge and experience in medical devices, combination products, and global regulatory affairs.  Prior to joining the practice, Nicholas led tactical and strategic regulatory affairs for large (Fortune 100) global business segments in the medical device and pharmaceutical sectors. In addition, Nicholas spent 7 years with the US-FDA Center for Devices and Radiological Health focused on regulatory science, regulatory review, and science-based decision making for total product lifecycle and public health issues.  His experience has crossed a diverse range of disease states and technologies including: cardiovascular and interventional cardiology, orthopedics, ophthalmics, diabetes, drug-delivery systems, biodegradable implants, digital health solutions, wearables, pediatric devices, and active implantable electronic devices.

 Nicholas is well versed in preparing regulatory submissions and providing stakeholders/customers with strategic direction and understanding of global regulatory landscapes, requirements, and risks.  He has represented large organizations to health authorities - leading interactions, negotiations, and alignment regarding pathways for new product development, clinical, lifecycle management, and responses to review inquiries/deficiencies/audit findings.  Device experience has included class II and class III devices (IDE, PMA, PMA supplements, 510k, CE marking), while combination product experience included early phase (IND, IMPD), registration (NDA, MAA), and post market support (sNDA).

Nicholas received a PhD in Materials Science and Engineering from the University of Pennsylvania and has led multidisciplinary laboratory research in polymer science and regulatory science to further the understanding of the fundamental scientific issues that underlie regulatory decisions for new/emerging biomedical technologies.  Laboratory work has investigated the complex inter-relationships between materials structure, manufacturing/processing methods, real-world performance, product safety/efficacy, and failure modes in materials, biomedical devices, and complex combination products.

## Academic Credentials & Professional Honors

Ph.D., Materials Science and Engineering, University of Pennsylvania, 2006

M.S., Materials Science and Engineering, University of Pennsylvania, 2004

B.S., Physics, Saint Joseph's University, 2001

B.S., Chemistry, Saint Joseph's University, 2000

Member of Sigma Xi - Scientific Research Honor Society

Member of Sigma Pi Sigma – University Physics Honor Society

## Publications

Davis E.M., Benetatos N.M.*, Regnault W.F., Winey K.I., Elabd, Y.A.* The Influence of Thermal History on Structure and Water Transport in Parylene C Coatings Polymer 2011, 52, 5378-5386

Benetatos, N.M., Winey K.I., Nanoscale Morphology of Poly(styrene-ran-methacrylic acid) Ionomers: The Role of Preparation Methods, Thermal Treatments, and Acid Copolymer Structure Macromolecules, 2007, 40, 3223-3228.

Benetatos, N.M., Chan C.D., Winey K.I., Quantitative Morphology Study of Cu-neutralized Poly(styrene-ran-methacrylic acid) Ionomers: STEM Imaging, X-ray Scattering and Real-Space Structural Modeling. Macromolecules, 2007, 40, 1081-1088.

Benetatos, N.M., Heiney, P.A., Winey K.I., Reconciling STEM and X-ray Scattering data from a Poly(styrene-ran-methacrylic acid) Ionomer: Ionic Aggregate Size.  Macromolecules, 2006, 39, 5174-5176.

Benetatos, N.M., Smith, B.W., Heiney, P.A., Winey K.I., Toward Reconciliation of STEM and SAXS Data from Ionomers by Investigating Gold Nanoparticles. Macromolecules, 2005, 38, 9251-9257.

Benetatos, N.M., Winey K.I., Ionic Aggregates in Zn- and Na-neutralized Poly(ethylene-ran-methacrylic acid) Blown Films. Journal of Polymer Science B: Polymer Physics 2005, 43, 3549-3554.

### Presentations

2012 McGroddy Frontiers in Science Invited Lecture, St. Joseph's University–Philadelphia, PA

"Structure and Water Transport in Polymeric Coatings"

2006 American Physics Society, Baltimore Md – "Quantitative Reconciliation of STEM and SAXS data from Ionomers."

2005 American Physics Society, Los Angeles CA – "Toward Reconciliation of STEM and SAXS data from Ionomers by Investigating Gold Nanoparticles"

2004 Materials Research Society, Boston MA – "Application of Analytical Electron Microscopy Methods in Ionomer Systems: Using Nanoparticles to mimic Ionomer Morphology"

2004 American Physics Society, Montreal Qc – "Analytical Electron Microscopy Methods in Ionomer Systems"

## Peer Reviewer

Macromolecules

Polymer

Journal of Polymer Science B: Polymer Physics

## Appendix B

## List of Materials

# List of Materials Received

- All materials previously referenced in my report

## Legal Documents

- Second Amended Complaint, dated May 24, 2018
- Defendants' Second Rule 12(B)(6) Motion to Dismiss Plaintiffs' Second Amended Complaint and Exhibits, dated June 15, 2018
- Defendants' Answers to Second Amended Complaint and Exhibits, dated August 20, 2018
- Plaintiff Winston Ramkelawan's Notice of Service of Amended Objections and Answers to Defendant Globus Medical, Inc.'s and Globus Medical North America, Inc.'s First Set of Interrogatories Addressed to Plaintiff Winston Ramkelawan, dated April 15, 2019

## Deposition Testimony

- Deposition testimony and exhibit of Vindra Ramkelawan, dated May 6, 2019
- Deposition testimony and exhibit of Winston Ramkelawan, dated May 7, 2019

## Globus Production

- GM 000002 – GM 000015
- GM 000030 – GM 000040
- GM 000048 – GM 000070
- GM 000080 – GM 000100
- GM 000106 – GM 000210
- GM 000229 – GM 000231
- GM 000234 – GM 000288
- GM 000319 – GM 000339
- GM 000341 – GM 000351

- GM 000376 – GM 000398
- GM 000352 – GM 000375
- GM 000399 – GM 000597
- GM 000602 – GM 000616
- GM 000652 – GM 000671
- GM 000673 – GM 000679
- GM 000710
- GM 000741 – GM 000756
- GM 000758 – GM 000862
- GM 000883 – GM 001096
- GM 001161 – GM 001189
- GM 002817 – GM 003316
- GM 003396 – GM 003451
- GM 003541 – GM 0003547
- GM 003556 – GM 003605
- GM 003620 – GM 003649
- GM 003650 – GM 004414
- GM 014883 – GM 015152
- GM 015170 – GM 015695
- GM 016280 – GM 016293

## Plaintiff Reports and Material

- Plaintiff's Rule 26 Expert Disclosures, dated May 3, 2019
    - Exhibit A – Report and supporting documentation of Dr. Russell Dunn
    - Exhibit B – Report and supporting documentation of Dr. John Jarell
    - Exhibit C – Report and supporting documentation of Dr. Willam Brennan
    - Exhibit D - Report and supporting documentation of Dr. Craig Lichtblau
    - Exhibit E – Report and supporting documentation of Dr. Frederick Raffa

## Appendix C

## PMA Acceptance and Filing Review Checklist

*Contains Nonbinding Recommendations*

# Appendix A. Checklists for Acceptance and Filing of PMAs

## Checklist for Acceptance Review for PMAs

### (should be completed within 15 days of DCC receipt)

**PMA Number:** _____    **Date Received:** _____

**Device:** _____    **Procode:** _____

**Company Name/ Address:** _____

**Contact Name/Phone Numbers:** _____

**Lead Reviewer Name:** _____

| Preliminary Questions | | |
|---|---|---|
| **Answers in the shaded blocks indicate consultation with an identified Center advisor is needed. (Boxes checked in this section represent FDAs preliminary assessment of these questions at the time of administrative review.)** | **Yes** | **No** |
| 1. Is the product a device (per 201(h) of the FD&C Act) or a combination product with a device constituent part subject to review under PMA? If it appears not to be a device or such a combination product, or you are unsure, consult with the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer to determine the appropriate action and inform your division management. *Provide summary of Product Jurisdiction Officer's determination.*<br><br>If the product does not appear to be a device or such a combination product, mark "No." | | |
| 2. If the product is a device or a combination product with a device constituent part, is it subject to review by the Center in which the application was received? If you believe the application is not with the appropriate Center or you are unsure, consult with the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer to determine the appropriate action and inform your division management. *Provide a summary of the Product Jurisdiction Officer's determination.*<br><br>If application should not be reviewed by your Center, mark "No." | | |
| 3. If a Request for Designation (RFD) was submitted for the device or combination product with a device constituent part and assigned to your center, identify the RFD # and confirm the following:<br>• Is the device or combination product the same (e.g., design, formulation) as that presented in the RFD submission?<br>• Are the indications for use for the device or combination product identified in the PMA the same as those identified in the RFD submission?<br><br>If you believe the product or the indications presented in the PMA have changed from the RFD, or you are unsure, consult with the CDRH Product Jurisdiction Officer or appropriate CBER Product Jurisdiction Officer to determine the appropriate action and inform your division management. *Provide summary of Product Jurisdiction Officer's determination.*<br><br>If the answer to either question above is no, mark "No." | | |

18

*Contains Nonbinding Recommendations*

| | | | |
|---|---|---|---|
| 4. | Is the application for a combination product that contains as a constituent part an approved drug that is under exclusive marketing rights? (503(g)(5))<br>If "Yes," then contact the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer, provide a summary of the discussion with them, and indicate their recommendation/action. | | |
| 5. | Is class III/PMA review required for the device?<br><br>NOTE: If you believe an application is for a new type of device for which we have never received a marketing application and is thus class III/PMA, you should (1) complete the 510(k) decision tree to document why the device would be found NSE (*attach copy*) and (2) obtain concurrence from the CDRH 510(k) Program Director and ODE Deputy Office Director for Engineering and Science Review or appropriate CBER staff prior to the accepting the original PMA. *Attach a copy of the 510(k) Staff's concurrence.* | | |
| 6. | Is there a pending 510(k) for the same device with the same indications for use? The regulations allow FDA to refuse to file a PMA if a 510(k) for the same device is pending (21 CFR 814.42(e)(3)). | | |
| 7. | Is the applicant the subject of an Application Integrity Policy (AIP)? If "Yes", consult with the CDRH Office of Compliance/Division of Bioresearch Monitoring (OC/DBM - BIMO) or CBER Office of Compliance and Biologics Quality/Division of Inspections and Surveillance/Bioresearch Monitoring Branch (OCBQ/DIS/BMB) to determine the appropriate action. Check on web at<br>http://www.fda.gov/ICECI/EnforcementActions/ApplicationIntegrityPolicy/ucm134453.htm | | |

**If the answer to 1 or 2 appears to be "No," then stop review of the PMA and contact the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer.**

**If the answer to 3 appears to be "No," then stop the review and contact the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer.**

**If the answer to 4 is "Yes," then contact the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer, provide a summary of the discussion with them, and indicate their recommendation/action.**

**If the answer to 5 is "No", the PMA lead reviewer should consult division management and other Center resources to determine the appropriate action.**

**If the answer to 6 is "Yes," then stop review of the PMA, contact the CDRH 510(k) Staff and PMA Staff, or appropriate CBER staff.**

**If the answer to 7 is "Yes," then contact CDRH/OC/DBM– BIMO or CBER/OCBQ/DIS/BMB, provide a summary of the discussion with the BIMO Staff, and indicate BIMO's recommendation/action.**

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements<br>(21 CFR 814.20 unless otherwise indicated) | | | |
|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | |
| • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | **Present** | | **Not Present (No)** |
| | **Yes** | **N/A** | |
| A.   PMA Content | | | |
| 1.   Are all required sections in English or accompanied with an English translation? | ☐ | | ☐ |
| 2.   Is there a table of contents? | ☐ | | ☐ |
| 3.   Is a bibliography provided? | ☐ | ☐ | ☐ |
| a.   Have copies of key articles been provided and are English translations included, if appropriate?<br>Check "N/A" if applicant includes a statement that upon searching they found no literature related to their device | ☐ | ☐ | ☐ |
| 4.   If a device sample has been requested by FDA, has it been provided or if impractical to submit, has the applicant offered alternatives to allow FDA staff to view or access the device? | ☐ | ☐ | ☐ |
| 5.   Is there a summary of the contents of the PMA? | ☐ | | ☐ |
| 6.   Device Characteristics | | | |
| a.   Is a description of device included? | ☐ | | ☐ |
| i.   Pictorial representations? | ☐ | | ☐ |
| ii.   Materials specifications? | ☐ | | ☐ |
| • If there is a color additive present:<br>• has the color additive been identified by common name and chemical name, and<br>• has the amount of each color additive in the formulation by weight percent of the colored component and total amount (e.g., μg, ppm) in the device been provided? | ☐ | ☐ | ☐ |

20

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements (21 CFR 814.20 unless otherwise indicated) | | | |
|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | |
| • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | **Present** | | **Not Present (No)** |
| | **Yes** | **N/A** | |
| b. Is a description of the principles of operation of the device (including components) and properties relevant to clinical function present? | ☐ | | ☐ |
| 7. Is the Device Manufacturing Section included? (see the guidance entitled "Quality System Information for Certain Premarket Application Reviews," available at https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM070899. For original PMA or a panel-track supplement with a new manufacturing site or substantially different manufacturing procedures. | ☐ | ☐ | ☐ |
| a. Has a description of the methods, facilities, and controls used in the manufacture, processing, packing, storage, and installation of the device been provided? | ☐ | | ☐ |
| 8. Are summaries of the nonclinical laboratory studies and full test reports* provided?<br>Note: the applicant can reference data located in other submissions. Check "Yes" if nonclinical data is not provided in the current submission, but found in another submission. State where the data were provided (e.g., modular submission, licensing PMA).<br>*Full test report includes objective of the test, description of test methods and procedures, study endpoint(s), pre-defined pass/fail criteria, results summary, discussion of conclusions) | ☐ | ☐ | ☐ |
| a. Sterilization | ☐ | ☐ | ☐ |
| b. Biological/Microbiological | ☐ | ☐ | ☐ |
| c. Immunological | ☐ | ☐ | ☐ |
| d. Toxicological/Biocompatibility | ☐ | ☐ | ☐ |
| e. Engineering (stress, wear, etc.) | ☐ | ☐ | ☐ |
| f. Chemistry/Analytical (typically for IVDs) | ☐ | ☐ | ☐ |

21

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements (21 CFR 814.20 unless otherwise indicated) | | | | | |
|---|---|---|---|---|---|
| Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed. | | | | | |
| • Any "Not Present" answer will result in a "Refuse to Accept" decision. • Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | | | Present | | Not Present (No) |
| | | | Yes | N/A | |
| | g. | Shelf Life | ☐ | ☐ | ☐ |
| | h. | Animal Studies | ☐ | ☐ | ☐ |
| | i. | Other Essential Laboratory Testing | ☐ | ☐ | ☐ |
| 9. | | Is a summary of the clinical investigation(s) and results provided? | ☐ | | ☐ |
| | a. | Are the final versions of the clinical protocols included? (If performed under IDE, these should be the final FDA-approved versions of the clinical protocols, incorporating any Notices of Changes.) | ☐ | | ☐ |
| | b. | Is a description of study population demographics provided? | ☐ | | ☐ |
| | c. | Is a description of adverse events (e.g., adverse reactions, complaints, discontinuations, failures, replacements) given? | ☐ | | ☐ |
| | d. | Have report forms for patients who died or who did not complete the investigation been provided (i.e., to resolve potential bias)? Check "N/A" only if no patients died or were discontinued. | ☐ | ☐ | ☐ |
| 10. | | Are statistical analyses of the clinical investigations provided? | ☐ | | ☐ |
| | a. | Are the results of all analyses identified in the protocol provided? | ☐ | | ☐ |
| 11. | | Has appropriate draft labeling been submitted? | | | |
| | a. | Physician Labeling | ☐ | | ☐ |
| | i. | Are indications for use included? | ☐ | | ☐ |
| | ii. | Are contraindications, warnings, and precautions included? | ☐ | | ☐ |
| | iii. | Are instructions for use included? | ☐ | | ☐ |
| | b. | Patient Labeling Check "N/A" only if CDRH has indicated that patient labeling is not necessary. | ☐ | ☐ | ☐ |

22

*Contains Nonbinding Recommendations*

| | | Inventory of Organizational and Administrative Elements (21 CFR 814.20 unless otherwise indicated) | | | |
|---|---|---|---|---|---|
| | | **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | |
| | | • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | **Present** | | **Not Present (No)** |
| | | | **Yes** | **N/A** | |
| | c. | Technical/Operators Manual | ☐ | ☐ | ☐ |
| | 12. | Statements/Certifications/Declarations of Conformity | | | |
| | a. | Does the application utilize voluntary consensus standard(s) (See section 514(c) of the FD&C Act). *This includes both FDA-recognized and non-recognized consensus standards. Select "N/A" if the submission does not utilize voluntary consensus standards.* | ☐ | ☐ | |
| | i. | If the application cites FDA-recognized voluntary consensus standard(s), does the application include:<br><br>a Declaration of Conformity (DOC) as outlined in FDA's guidance "Appropriate Use of Voluntary Consensus Standards in Premarket Submissions for Medical Devices," available at https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM077295<br>**OR**<br>if citing general use of a standard, the basis of such use is included along with the underlying information or data that supports how the standard was used? | ☐ | ☐ | ☐ |
| | ii. | If the application cites non-FDA-recognized voluntary consensus standard(s), does the application include the basis of use along with the underlying information or data that supports how the standard was used? | ☐ | ☐ | ☐ |
| | b. | Has the applicant provided documentation to establish that it has followed the recommendations in applicable FDA guidance/guidelines or otherwise met applicable statutory or regulatory criteria?<br>Check "N/A" only if no guidance/guidelines are used. | ☐ | ☐ | ☐ |

23

*Contains Nonbinding Recommendations*

| **Inventory of Organizational and Administrative Elements** <br> **(21 CFR 814.20 unless otherwise indicated)** | | | | | |
|---|---|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | | | |
| <ul><li>Any "Not Present" answer will result in a "Refuse to Accept" decision.</li><li>Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application.</li></ul> | | | **Present** | | **Not Present (No)** |
| | | | **Yes** | **N/A** | |
| | c. | Investigator Financial Disclosure <br> For additional information refer to the guidance document "Financial Disclosure by Clinical Investigators," available at https://www.fda.gov/RegulatoryInformation/Guidances/UCM341008. <br><br> As required by 21 CFR Part 54, has the applicant submitted either: <br> 1. A signed and dated Certification Form (3454) or <br><br> 2. A signed and dated Disclosure Form (3455) <br><br> Note: the signature should be from a responsible corporate official or representative of the applicant. | ☐ <br><br> ☐ | ☐ <br><br> ☐ | ☐ <br><br> ☐ |
| | | i. For a Certification Form (3454): Is the required list of all investigators and subinvestigators attached to the Form? | ☐ | ☐ | ☐ |
| | | ii. If box 3 is checked, does the Form include an attachment with the reason(s) why financial disclosure information could not be obtained? | ☐ | ☐ | ☐ |
| | | iii. For a Disclosure Form (3455): Does the application provide details of the financial arrangements and interests of the investigator(s) or subinvestigator(s), along with a description of any steps taken to minimize potential bias? | ☐ | ☐ | ☐ |
| | d. | Environmental Assessment under 21 CFR 25.20(n) ((d)(i) or (ii) | ☐ | | ☐ |
| | | i. If claiming a categorical exclusion, information to justify the exclusion, OR | ☐ | ☐ | ☐ |
| | | ii. An environmental assessment (ONLY required for devices that present new environmental concerns) | ☐ | ☐ | ☐ |

24

*Contains Nonbinding Recommendations*

<table>
<tr><td colspan="4"><strong>Inventory of Organizational and Administrative Elements<br>(21 CFR 814.20 unless otherwise indicated)</strong></td></tr>
<tr><td colspan="4"><strong>Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.</strong></td></tr>
<tr><td colspan="2">• Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application.</td><td colspan="2"><strong>Present</strong></td><td><strong>Not Present</strong></td></tr>
<tr><td></td><td></td><td><strong>Yes</strong></td><td><strong>N/A</strong></td><td><strong>(No)</strong></td></tr>
<tr><td>e.</td><td>Did the application include a completed FORM FDA 3674, *Certification with Requirements of ClinicalTrials.gov Data Bank?* (42 U.S.C. 282(j)(5)(B))<br><br>Note: Enter the NCT number(s) in CTS or other regulatory tracking database</td><td>☐</td><td></td><td>☐</td></tr>
<tr><td></td><td>Data from FORM FDA 3674 (mark "Yes" for the applicable one):</td><td></td><td></td><td></td></tr>
<tr><td>i.</td><td>No clinical trials referenced in submission.</td><td>☐</td><td>☐</td><td></td></tr>
<tr><td>ii.</td><td>Requirements are not applicable to referenced clinical trials.</td><td>☐</td><td>☐</td><td></td></tr>
<tr><td>iii.</td><td>Requirements are applicable and have been met.</td><td>☐</td><td>☐</td><td></td></tr>
<tr><td>f.</td><td>Statements of Compliance for Clinical Investigations<br><br>Select "N/A" if the application does not contain any clinical data from investigations (as defined in 21 CFR 812.3(h)) to demonstrate reasonable assurance of safety and effectiveness.<br><br>For multicenter clinical investigations involving both United States (US) and outside the United States (OUS) sites, part (i) should be addressed for the US sites and part (ii) should be addressed for the OUS sites. 21 CFR 812.28 applies to all OUS clinical investigations that enroll the first subject on or after February 21, 2019.<br><br>Please refer to the guidance document entitled "*Acceptance of Clinical Data to Support Medical Device Applications and Submissions - Frequently Asked Questions,*" available at https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM597273, for more information.</td><td>☐</td><td>☐</td><td></td></tr>
</table>

25

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements (21 CFR 814.20 unless otherwise indicated) | | | | | |
|---|---|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | | | |
| • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | | | **Present** | | **Not Present (No)** |
| | | | **Yes** | **N/A** | |
| | i. | For all clinical investigations conducted in the US, the application includes one of the following for each investigation (*check all that apply*):<br>☐ A statement of compliance with 21 CFR parts 50, 56, and 812.<br>☐ A brief statement of the reason for noncompliance with 21 CFR parts 50, 56, and 812.<br>*Select "N/A" if the clinical investigations were conducted solely OUS.* | | ☐ | ☐ |
| | ii. | For all clinical investigations conducted OUS, the application includes one of the following for each investigation (*check all that apply*):<br>☐ A statement that the clinical investigations were conducted in accordance with good clinical practice (GCP) as described in 21 CFR 812.28(a)(1).<br>☐ A brief statement of the reason for not conducting the investigation in accordance with GCP and a description of steps taken to ensure that the data and results are credible and accurate and that the rights, safety, and well-being of subjects have been adequately protected.<br>☐ A waiver request in accordance with 21 CFR 812.28(c).<br>*Select "N/A" if the clinical investigations were conducted solely inside the US.* | | ☐ | ☐ |
| 13. | | Pediatric Use - Per 515A(a)(2) of the FD&C Act, did the application include: | | | |
| | a. | A description of any pediatric subpopulations that suffer from the disease or condition that the device is intended to treat, diagnose, or cure, or statement that no pediatric subpopulation exists for the disease or condition for which the device is intended. This statement does not mean the device is indicated for treating pediatric patients. | | ☐ | ☐ |

26

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements (21 CFR 814.20 unless otherwise indicated) | | | | | |
|---|---|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | | | |
| | | • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | **Present** Yes | **Present** N/A | **Not Present (No)** |
| | | b. | The number of affected pediatric patients. | ☐ | | ☐ |
| | 14. | | Combination Product Provisions – Per 503(g) of the FD&C Act. Select "N/A" if the product is not a combination product. 21 CFR 3.2(e). The remaining criteria in this section will be omitted from the checklist if "N/A" is selected. If you are unsure if the product is a combination product, consult with the CDRH Product Jurisdiction Officer or CBER Product Jurisdiction Officer. | | ☐ | |
| | | a. | Application identifies the product as a combination product. | ☐ | | ☐ |
| | | b. | The combination product contains as a constituent part an approved drug as defined in section 503(g)(5)(B) of the FD&C Act. Select "N/A" if the combination product does not contain as a constituent part an approved drug. Please also select "N/A" if a right of reference or use for the drug constituent part(s) is included with the application. If "N/A" is selected, part a below is omitted from the checklist. | ☐ | ☐ | |
| | | i. | The application includes appropriate patent statement or certification and a statement that the applicant will give notice, as applicable. See 503(g)(5)(A)&(C). | ☐ | | ☐ |
| B. | | | Issues Identified by FDA Prior to PMA Application - history of the applicant with this device | | | |
| | 1. | | Does the applicant list prior submissions or state that there were no prior submissions?<br>(may be located in CDRH Coversheet Form 3514, Section F)<br><br>If the applicant lists prior submissions, address the applicable questions below: | ☐ | | ☐ |
| | | a. | 510(k) #_____ | ☐ | ☐ | |

27

*Contains Nonbinding Recommendations*

| Inventory of Organizational and Administrative Elements<br>(21 CFR 814.20 unless otherwise indicated) | | | | |
|---|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | | |
| • Any "Not Present" answer will result in a "Refuse to Accept" decision.<br>• Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application. | | | **Present** | **Not Present (No)** |
| | | | **Yes** / **N/A** | |
| | | i. | If this device has been the subject of an NSE decision, does the PMA address any issues relating to safety or effectiveness? | ☐ ☐ | ☐ |
| | b. | IDE #_____ | | ☐ ☐ | |
| | | i. | Have the data presented in the PMA taken into account any safety or effectiveness concerns (e.g., "future considerations") previously communicated through IDE correspondence? | ☐ ☐ | ☐ |
| | c. | PMA #_____ | | ☐ ☐ | |
| | | i. | If a previously submitted PMA for this device been withdrawn, does the current PMA address any issues related to safety or effectiveness raised during review of the prior PMA? | ☐ ☐ | ☐ |
| | d. | Modular PMA #_____ | | ☐ ☐ | |
| | | i. | If "Yes", how many modules submitted? _____<br><br>How many modules were closed? _____ | | |
| | | ii. | If there are modules that are on hold, does the PMA address outstanding deficiencies? | ☐ ☐ | ☐ |
| 2. | | | Does the applicant list Pre-Submission(s) regarding the device or this application in which FDA feedback regarding data or information related to safety and/or effectiveness in the PMA was provided by email or during a meeting (in person or by phone), or state that there were no prior Pre-Submission interactions with the FDA regarding this application?<br><br>If the applicant lists Pre-Submissions, address the applicable questions below: | ☐ | ☐ |

28

*Contains Nonbinding Recommendations*

| **Inventory of Organizational and Administrative Elements**<br>**(21 CFR 814.20 unless otherwise indicated)** | | | | |
|---|---|---|---|---|
| **Check "Yes" if item is present, "N/A" if it is not needed and "Not Present" if it is not included but needed.** | | | | |
| | <ul><li>Any "Not Present" answer will result in a "Refuse to Accept" decision.</li><li>Each element on the checklist should be addressed within the application. An applicant may provide a rationale for omission for any criteria that are deemed not applicable. If a rationale is provided, the criteria is considered Present ("Yes"). An assessment of the rationale will be considered during the review of the application.</li></ul> | **Present** | | **Not Present (No)** |
| | | **Yes** | **N/A** | |
| a. | Pre-Submission #_____<br>Meeting date(s), if applicable_____ | | | |
| b. | Copy of minutes from each meeting or other written feedback? | ☐ | ☐ | ☐ |
| c. | Were all staff concerns or action items previously presented to the applicant in the Pre-Submission minutes or feedback addressed in the PMA or has the applicant provided a detailed scientific or clinical justification for an alternative approach? | ☐ | ☐ | ☐ |

29

*Contains Nonbinding Recommendations*

| Acceptance Decision Questions | | | |
|---|---|---|---|
| **A "No" answer will result in an RTA decision.** | | | |
| | | Yes | No |
| **Decision 1** | **Is the PMA complete?**<br><br>**If, on its face, the PMA is missing one or more required elements (identified above), answer "No."** | ☐ | ☐ |
| **Decision 2** | **From only an administrative review, does the PMA include information that appears to constitute valid scientific evidence?**<br><br>**Only answer "No" if it is clear that the PMA is supported solely by information that 21 CFR 860.7 identifies as not constituting valid scientific evidence:**<br>• **isolated case reports**<br>• **random experience**<br>• **reports lacking sufficient details to permit scientific evaluation**<br>• **unsubstantiated opinions**<br><br>**Comments:** | ☐ | ☐ |
| **Decision 3** | **Does the PMA address the key nonclinical and clinical issues identified by FDA prior to submission of the PMA application?**<br><br>**OR** | ☐ | ☐ |
| | **Has the applicant provided a detailed scientific or clinical justification for the alternate approach?**<br><br>***See the guidance document (*Acceptance and Filing Review for Premarket Approval Applications (PMAs), pages 14-15*) for interpretation of this criterion.* | ☐ | ☐ |

<u>**Decision:**</u>  **Accept \_\_\_\_      Refuse to Accept \_\_\_\_**

**If Accept, notify applicant; if Refuse to Accept, notify applicant and include a copy of this checklist.**

30

*Contains Nonbinding Recommendations*

| Digital Signature Concurrence Table | |
|---|---|
| Reviewer Sign-Off | |
| Branch Chief Sign-Off | |
| Division  Sign-Off | |

**Only proceed to the "Filing Review" section if the file is Accepted, indicating that review can continue.**

31

*Contains Nonbinding Recommendations*

# Checklist for Filing Review for PMAs

| <span>**Filing Assessment of Technical Elements** – Clinical Studies</span> | | | |
|---|---|---|---|
| **Check "Yes" if the information submitted is considered adequate to permit substantive review, "N/A" if it is not needed and "No" if it is not included.** | | | |

| | | Present | | Not Present (No) |
|---|---|---|---|---|
| | | Yes | N/A | |
| A. | Consistency of study data: 1) with the protocol in the approved IDE (if one was required) or with the sponsor's study protocol for a foreign study (i.e., conducted solely outside of the U.S.); 2) with recommendations from a Pre-Submission interaction, if applicable; and/or 3) in accordance with a device-specific guidance document, if applicable. | | | |
| | 1. Sample size/number of patients enrolled and completing the study ( i.e., the number of evaluable patients at the primary endpoint timeframe) | ☐ | | ☐ |
| | 2. Follow-up duration for the primary analysis | ☐ | | ☐ |
| | 3. Follow-up evaluations for the primary analysis | ☐ | | ☐ |
| | 4. Study Objectives | ☐ | | ☐ |
| | 5. Study Population/Enrollment Criteria | ☐ | | ☐ |
| | 6. Study Endpoints | ☐ | | ☐ |
| | 7. Study Design | ☐ | | ☐ |
| | 8. Hypothesis | ☐ | | ☐ |
| | 9. Statistical Analysis | ☐ | | ☐ |
| |    a. Effectiveness | ☐ | | ☐ |
| |    b. Safety Analyses | ☐ | | ☐ |
| B. | Appropriateness of key aspects of the protocol | | | |
| | 1. Does the patient/study population match the intended use? | ☐ | | ☐ |
| | 2. Have clinically significant endpoints been selected? | ☐ | | ☐ |
| | 3. If the primary study is based on foreign clinical data, does the applicant provide a justification with respect to how the data are applicable to the U.S. patient population (e.g., are the population and medical practices comparable to those in the U.S., or if not, has a justification been provided for why any differences would not impact the applicability of | ☐ | | ☐ |

32

*Contains Nonbinding Recommendations*

| | | **Present** | | **Not Present (No)** |
|---|---|---|---|---|
| | | **Yes** | **N/A** | |

### Filing Assessment of Technical Elements – Clinical Studies

**Check "Yes" if the information submitted is considered adequate to permit substantive review, "N/A" if it is not needed and "No" if it is not included.**

| | | the study results to the U.S. patient population [21 CFR 814.15(a) and 814.15(b)])? | | |
|---|---|---|---|---|
| | | | | |

### Filing Decision Questions

**The Filing Decision Questions are shaded and bolded. Some Filing Decision Questions are preceded by introductory questions (denoted by suffixes "a" and "b") to ensure that those Filing Decision Questions are answered appropriately.**

| | | Yes | No |
|---|---|---|---|
| Decision 1a | Was each study completed and analyzed per the protocol (answers to A1-9 under "Filing Assessment of Technical Elements")? <br> • If "Yes," answer "Yes" to Decision 1 below. <br> • If "No," describe and continue on to Decision 1b. <br> Comments: | ☐ | ☐ |
| Decision 1b | If any study was not completed per the protocol, did the applicant provide a detailed scientific or clinical justification for this alternate approach, without the intention of updating the PMA with additional data? <br> • If "Yes," describe and answer "Yes" to Decision 1 below. <br> • If "No" (i.e., no justification is provided, or a clinical update is intended), describe and answer "No" to Decision 1 below. <br> Comments: | ☐ | ☐ |
| **Decision 1** | **Were the clinical study data collected and analyzed per the protocol?** | ☐ | ☐ |
| Decision 2a | Were the studies performed using the final device design (i.e., the device design intended to be marketed)? <br> • If "Yes," answer "Yes" to Decision 2 below. <br> • If "No," describe and continue on to Decision 2b. <br> Comments: | ☐ | ☐ |

33

*Contains Nonbinding Recommendations*

| Filing Decision Questions | | | |
|---|---|---|---|
| The Filing Decision Questions are shaded and bolded. Some Filing Decision Questions are preceded by introductory questions (denoted by suffixes "a" and "b") to ensure that those Filing Decision Questions are answered appropriately. | | | |
| | | **Yes** | **No** |
| Decision 2b | If the studies were performed using an earlier device design, did the applicant provide a detailed scientific or clinical justification for why the changes made do not impact safety AND effectiveness?<br>• If "Yes," describe and answer "Yes" to Decision 2 below.<br>• If "No" (i.e., device changes were made that could impact safety OR effectiveness and no justification is provided), describe and answer "No" to Decision 2 below.<br>Comments: | ☐ | ☐ |
| **Decision 2** | **Were the nonclinical and clinical data collected on the final design of the device (i.e., the device design intended to be marketed)?** | ☐ | ☐ |

| | | | |
|---|---|---|---|
| Decision 3a | Does the patient/study population match the device's indication for use, are the endpoints clinically relevant, and, if the pivotal study was conducted outside the U.S., does the applicant discuss why the data are adequate to support approval in that the foreign data/patient population and medical practice are applicable to those of the U.S. (answers to B1-3 under "Filing Assessment of Technical Elements")?<br>• If "Yes," answer "Yes" to Decision 3 below.<br>• If "No," describe and continue on to Decision 3b.<br>Comments: | ☐ | ☐ |
| Decision 3b | If "No" to question 3a, did the applicant provide a detailed scientific or clinical justification?<br>• If "Yes," describe and answer "Yes" to Decision 3 below.<br>• If "No," describe and answer "No" to Decision 3 below.<br>Comments: | ☐ | ☐ |
| **Decision 3** | **Were the patient/study population and endpoints selected appropriately?** | ☐ | ☐ |

**Decision:** Review Team Recommendation: File ____   Not File ____

34

*Contains Nonbinding Recommendations*

| Digital Signature Concurrence Table | |
| --- | --- |
| Reviewer Sign-Off | |
| Branch Chief Sign-Off | |
| Division Sign-Off | |

35