## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

WINSTON RAMKELAWAN and
VINDRA RAMKELAWAN,

      Plaintiffs,

v.                              Case No: 5:18-cv-100-Oc-30PRL

GLOBUS MEDICAL INC.,

      Defendant.

_____

## <u>ORDER</u>

Winston Ramkelawan became a quadriplegic after the core of Globus Medical Inc.'s SECURE-C® Cervical Artificial Disc expelled and injured his spinal cord. The Ramkelawans[1] claim the SECURE-C core expelled and injured Ramkelawan because the device was defectively manufactured by Globus. Globus contends the device was properly manufactured and the core expelled due to the negligence of the surgeon who implanted it.

To support their respective positions, the parties have retained numerous experts. Now the parties are moving to exclude some of the opposing experts under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993), and the Federal Rules of Evidence. The Ramkelawans move to exclude two of Globus's experts, and Globus moves to exclude four of the Ramkelawans' experts. The Court will discuss each motion below.

---

[1] The Court will use "Ramkelawan" to refer specifically to Winston Ramkelawan, and "Ramkelawans" to refer to Plaintiffs Winston Ramkelawan and Vindra Ramkelawan jointly.

## BACKGROUND

On May 11, 2015, Ramkelawan had the SECURE-C device implanted in his neck. The SECURE-C, designed and manufactured by Globus, is an artificial disc implanted in the spine as an alternative to spinal fusion surgery and allows greater mobility. Two days after the surgery, Ramkelawan was lying in bed when he heard a pop and lost feeling from his chest down. Ramkelawan was taken to a hospital where it was determined that the SECURE-C's core expelled, injuring his spinal cord and rendering him a quadriplegic.

The SECURE-C device comprises an ultra-high-molecular-weight-polyethylene ("UHMWPE") core fitted between anterior and inferior endplates composed of highly polished cobalt chromium molybdenum alloy. The inferior, or bottom, endplate has engagement recesses that allow it to connect to the core, locking it into place.

The SECURE-C is classified by the U.S. Food and Drug Administration as a Class III medical device, which is governed by the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360c(a)(1)(C). Class III medical devices are subject to the FDA's premarket approval ("PMA") process and are heavily regulated under federal law. Globus must produce, manufacture, and distribute the SECURE-C pursuant to the design specifications approved by the FDA in the PMA.

In this lawsuit, Ramkelawan argues that the SECURE-C device implanted into his neck was defectively manufactured and did not comply with the design specifications approved by the FDA in the PMA. Based on these alleged defects, Ramkelawan is suing Globus for manufacturing defect in claims for strict liability and negligence, and Ramkelawan's wife is suing Globus for loss of consortium.

Globus disputes that SECURE-C was defectively manufactured. Instead, Globus argues that the core expelled due to the negligence of the implanting surgeon, Dr. Barry Kaplan. Globus argues that Dr. Kaplan wrongly determined that Ramkelawan was a candidate for the SECURE-C and that Dr. Kaplan improperly implanted the device.

## STANDARD FOR EXCLUDING EXPERT TESTIMONY

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"'[T]he task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand' is assigned to the district court." *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

In *Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005), the Eleventh Circuit explained:

> To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence.

*Id.* at 1291–92 (internal quotation marks omitted).

In assessing the reliability of a scientific expert's testimony, district courts should consider the following four factors: (1) whether the expert's methodology has been tested or can be tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *United Fire & Cas. Co.*, 704 F.3d at 1341 (citing *Daubert*, 509 U.S. at 593–94). "At the same time, the [Supreme] Court has emphasized that these factors are not exhaustive and are intended to be applied in a 'flexible' manner." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

With respect to experts with technical rather than scientific knowledge the Supreme Court in *Kumho Tire* concluded that:

> *Daubert*'s general holding—setting forth the trial judge's general "gatekeeping" obligation—applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See* Fed. Rule Evid. 702. We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

526 U.S. at 141–42.

The objective of *Daubert*'s gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field." *Id.* at 152. The gatekeeping role is "significant" because an "expert's opinion 'can be both powerful and quite misleading.'" *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert,* 509 U.S. at 595). *Daubert* also reminds litigants that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

<u>**DISCUSSION**</u>

The Court will discuss the various *Daubert* motions separately, beginning with the Ramkelawans' motions and then turning to Globus's motion. With each expert, the Court will briefly summarize the opinions of the witness before analyzing whether those opinions should be excluded.

**A. The Ramkelawans' Motions to Exclude Globus's Experts**

**1. Motion to exclude Dr. Nicholas Benetatos (Doc. 99)**

**a. Dr. Nicholas Benetatos's opinion**

The Ramkelawans argue the SECURE-C device implanted in Ramkelawan was defectively manufactured. Because the SECURE-C is a Class III medical device, it had to go through the FDA's PMA process. Once it received PMA approval, Globus had to manufacture SECURE-C devices pursuant to the approved process, any deviation from which could constitute a manufacturing defect. As will be explained more thoroughly below, the Ramkelawans argue that the subject SECURE-C device was not manufactured in accordance with the approved process because (1) the core of the SECURE-C oxidized

during manufacturing, (2) the core's surface roughness is not to specification, (3) the core's height is not to specification, and (4) the core's shape is not to specification.

To rebut these arguments, Globus retained Dr. Nicholas Benetatos, an FDA regulatory expert. Dr. Benetatos reviewed voluminous records, including the SECURE-C's PMA manufacturing requirements, Globus's manufacturing records, clinical studies (both before and after receiving PMA approval), regulatory filings, and standard operating procedures. Based on the analysis of these documents and his experience, Dr. Benetatos opined that:

> Opinion 1 – The FDA approval of the SECURE-C PMA, based on the totality of data provided, affirms that the design and manufacturing of SECURE-C cervical total artificial disc (core and endplates) are safe and efficacious for their intended use.
>
> Opinion 2 – The PMA approval affirms that the manufacturing process to produce the SECURE-C cervical total artificial disc and the quality control framework in which the device is manufactured met the most rigorous FDA requirements. As Globus Medical met these requirements in manufacturing the subject SECURE-C (core and endplates) - there is no basis to support any opinion that: the subject device (core and endplates) was defectively manufactured, the production of the subject device yielded defective and undetected product that would pose a significant risk to patient safety, or that the manufacturing process and the quality management system that governs that process are in any way deficient.
>
> Opinion 3 – It is critical to consider that the performance of medical devices is multifactorial and includes numerous device, surgical, and patient factors. The clinical study data and post-market safety data relating to potential core migrations of the SECURE-C cervical total artificial disc do not support any opinion that the subject device was defectively manufactured or that the manufacturing process produces undetected and defective products.

(Docs. 99-1, p. 12). In other words, Dr. Benetatos opines that Globus complied with the FDA manufacturing requirements, and that, because Globus complied with those requirements, the subject SECURE-C is free from manufacturing defects.

### b. Analysis

The Ramkelawans argue Dr. Benetatos's opinions must be excluded because (1) "Dr. Benetatos employed no scientific methods or principles to reach any of his conclusions"; and (2) Dr. Benetatos's opinions will not assist the jury. (Doc. 99, p. 4). The Ramkelawans further categorize Dr. Benetatos's opinions as *ipse dixit*. The Court disagrees.[2]

Contrary to the Ramkelawans' arguments, Dr. Benetatos's opinions are supported by reliable methodology. Dr. Benetatos reviewed the manufacturing requirements for the SECURE-C that were approved by the FDA after testing showed them to be reliable (including standard operating procedures and quality control measures), then reviewed Globus's manufacturing records for the lot that included the subject SECURE-C core and endplates. Based on the review of these documents, Dr. Benetatos opined that Globus followed the manufacturing requirements set forth by the FDA, that the manufacturing process was fully documented as to the subject SECURE-C's components, and that there were no deviations when manufacturing the subject SECURE-C's components. This evidences a reliable methodology to support Dr. Benetatos's opinions. *See Kruszka v.*

---

[2] The Ramkelawans do not argue Dr. Benetatos is unqualified to offer his opinions, so the Court does not address that prong in its analysis. As with this motion, the Court will only address the arguments raised in analyzing the remaining motions, too.

*Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) ("Conversely, testimony that Novartis acted in accordance with regulations or established procedure which reflects diligence; or fact-based testimony that the FDA 'found no fault with the company conduct'; or testimony that opines on what the FDA or Novartis actually did, rather than thought, are properly within the scope of admissible testimony.").

The Court also concludes that Dr. Benetatos's opinions will assist the jury. As other courts have recognized, a lay person cannot be expected to understand the complex regulatory framework required for manufacturing products subject to FDA oversight. *See e.g.*, *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) ("A lay jury cannot be expected to understand the complex regulatory framework that informs the standard of care in the pharmaceutical industry."). Dr. Benetatos's experience and expertise in this area will assist the jury in concluding whether Globus deviated from the FDA's manufacturing requirements for the lot containing the subject SECURE-C components.

Because Dr. Benetatos's opinions and testimony are based on reliable methodology and will assist the jury, the Court concludes that the Ramkelawans' motion to exclude should be denied.

## 2.  Motion to exclude Dr. Rajesh Bhojwani (Doc. 101)

### a.  Dr. Rajesh Bhojwani's opinion

The Ramkelawans seek to exclude the opinion of Dr. Rajesh Bhojwani, a board-certified neuro-radiologist who reviewed radiological studies and imaging related to Ramkelawan. The Ramkelawans do not bring a typical *Daubert* challenge targeting Dr. Bhojwani's qualifications or opinions; instead, they argue his testimony should be

excluded because it is cumulative, under Federal Rule of Evidence 403, of the opinions of another Globus expert, Dr. A. Jay Khanna. Dr. Khanna is an orthopedic spine surgeon who also, as part of his specialty, reviews radiographic images.

Dr. Bhojwani intends to opine that: (1) Ramkelawan's "spine had evidence of instability and hypermobility preoperatively"; (2) "most spine surgeons would have found [Ramkelawan] to be a better candidate for a cervical fusion and not a candidate for cervical disc replacement"; (3) Ramkelawan's "spinal cord was worse off after the surgery than prior to the surgery"; and (4) "the displacement of the core was caused by the multi-level instability of the cervical spine and the hypermobility present at the C5-C6 level that was worsened by a discectomy without fusion coupled with misalignment of the device endplates." (Doc. 101-1).

Dr. Khanna intends to opine that: (1) "Mr. Ramkelawan's cervical spine was unstable prior to the surgery on May 11, 2015 and he was not a candidate for a cervical disc replacement at C5-C6"; (2) "The multi-level instability of Mr. Ramkelawan's cervical spine and hypermobility at the C5-C6 level caused the displacement of the polyethylene core from the disc arthroplasty device"; (3) "The misalignment of the device endplates contributed to the displacement of the polyethylene core from the disc arthroplasty device"; (4) "I agree with Dr. Bhojwani's interpretation of the radiographic studies outlined in his report [] and also his opinions regarding this case"; (5) "Dr. Barry Kaplan acted outside of the standard of care in failing to assess the stability of the cervical spine, in choosing to perform a disc arthroplasty procedure on May 11, 2015 and by not ensuring proper positioning and placement of the Secure-C disc arthroplasty device given that the endplates

9

were misaligned"; (6) "The Globus complaint files involving 'potential' core displacements do not present similar circumstances to those presented here and do not support Plaintiffs' expert's opinions that the subject core displaced because of a manufacturing defect"; and (7) "The development, significance and severity of Mr. Ramkelawan's post-surgery condition which included bed sores and gangrene are attributable to his post-surgery care (and/or lack thereof) and predispositions including psoriasis and diabetes mellitus." (Doc. 110-5).

### b. Analysis

Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … needlessly presenting cumulative evidence." Applying this balancing test, the Court concludes the probative value of Dr. Bhojwani's testimony is not substantially outweighed by the danger of needlessly presenting cumulative evidence.

While there may be some overlap in the opinions of Drs. Bhojwani and Khannan, that alone does not constitute needlessly presenting cumulative evidence. *Bodner v. Royal Caribbean Cruises, Ltd.*, No. 17-20260-CIV, 2018 WL 2471215, at *5 (S.D. Fla. Apr. 10, 2018) ("Indeed, '[t]he fact that their testimony and opinions may overlap to some extent does not demonstrate a sufficient basis of undue delay, waste of time, or needless presentation of cumulative evidence under Fed. R. Evid. 403 to bar the testimony of either witness.'"). Drs. Bhojwani and Khannan reached their conclusions primarily based on different methodologies—with Dr. Bhojwani reaching his conclusions after reviewing radiographic images, and Dr. Khannan reviewed medical records in addition to

radiographic images in the way a clinician would review the evidence. Because Drs. Bhojwani and Khannan reached their conclusions through analysis of different evidence, their opinions are not cumulative. *See Johnson v. United States*, 780 F.2d 902, 906 (11th Cir. 1986) (holding a trial court abused its discretion by excluding an expert witness's testimony as cumulative when the expert based his opinion on evidence upon which others experts did not rely and where his analysis differed from other experts, which meant his testimony was "at least partially non-cumulative.").

Because the probative value of Dr. Bhojwani's opinions is not substantially outweighed by a danger of being needlessly cumulative under Rule 403, the Court must deny the Ramkelawans' motion to exclude his testimony.

**B. Globus's Motions to Exclude the Ramkelawans's Experts**

**1. Motion to exclude Dr. William Brennan (Doc. 94).**

**a. Dr. William Brennan's opinion**

The Ramkelawans retained Dr. Brennan to offer these opinions: "that Mr. Ramkelawan was an appropriate candidate for the SECURE-C surgery, that Dr. Kaplan did not deviate from the standard of care during his treatment of Mr. Ramkelawan, that the SECURE-C was the cause of Mr. Ramkelawan's paralysis, and how the SECURE-C's injury of Mr. Ramkelawan's spinal cord impacts the human body." (Doc. 112, pp. 26–27).

**b. Analysis**

Globus argues Dr. Brennan's opinions should be excluded for numerous reasons.

- First, Globus argues that Dr. Brennan's opinions that Dr. Kaplan did not breach the standard of care is unreliable because both Drs. Brennan and Kaplan admit

that Dr. Kaplan did not follow protocol before implanting the SECURE-C. Specifically, Dr. Kaplan did not obtain x-rays (either flexion or AP and lateral) before performing the surgery.

- Second, Globus argues that Dr. Brennan's opinion that Ramkelawan was a proper candidate for the SECURE-C is unreliable because Dr. Brennan concludes Ramkelawan did not have spinal instability, which is not supported by the facts of this case or based on sound methodology.

- Third, Globus seeks to exclude Dr. Brennan's opinion that the SECURE-C core failed, causing the injury to Ramkelawan, because the opinions are conclusory and underdeveloped.

- Fourth, Globus argues Dr. Brennan's opinion that the SECURE-C is defectively designed, which is not an opinion included in his report, should be excluded because it is (1) preempted and (2) is unreliable.

- Fifth, Globus seeks to exclude Dr. Brennan's opinion that Ramkelawan's quadriplegic injury "has well documented clinical consequences" and his opinions regarding past and future medical costs because the opinions are vague, have no relation to the facts of this case, and merely speculate about possible consequences of quadriplegia without tying the opinions to Ramkelawan individually. Globus also argues these opinions would be needlessly cumulative under Rule 403 since the Ramkelawans have identified other experts to opine on Ramkelawan's past and future medical needs.

- Sixth, and finally, Globus argues Dr. Brennan's opinions were fabricated solely for purposes of litigation, as evidenced by (1) Ramkelawan's position that Dr. Kaplan committed medical malpractice in a prior lawsuit; (2) Dr. Brennan's failure to consider evidence showing Ramkelawan had spinal instability; (3) Dr. Brennan conclusion that Dr. Kaplan did not breach the standard of care despite Dr. Kaplan not following the protocol Dr. Brennan testified he would have used; and (4) Dr. Brennan opinions on issues upon which he is not qualified.[3]

The Ramkelawans argue Dr. Brennan's methodology was reliable and that Globus mischaracterizes the testimony of Drs. Brennan and Kaplan. That said, the Ramkelawans do not contest Globus's objections to Dr. Brennan opining on whether the SECURE-C was defectively designed or what caused the core to expel (Globus' third and fourth arguments) because Dr. Brennan does not intend to opine on those issues. The Ramkelawans did not respond to Globus' fifth argument regarding Dr. Brennan's opinions on the clinical consequences of quadriplegia and his opinion on the past and future medical costs for Ramkelawan, so the Court concludes the Ramkelawans also do not oppose that argument. That leaves the Court to resolve only Globus's first, second, and sixth arguments.

As to the contested bases, the Court concludes Globus's motion should be denied. The evidence, including Dr. Kaplan's testimony, does not conclusively establish that

---

[3] In its reply, Globus also argues a purported new opinion of Dr. Brennan's should be excluded because it was generated by the Ramkelawans' counsel. To the extent Dr. Brennan intends to offer an opinion that was not disclosed in his expert report, the Motion is granted. The same is true of Globus's objections to alleged new opinions created by the Ramkelawans' counsel related to Drs. Jarrell and Dunn.

Ramkelawan's spinal instability was evident before implantation of the SECURE-C. As such, the Court cannot say that Dr. Brennan's opinion is not based on the facts. Whether Dr. Brennan properly considered all available evidence is a matter best left for cross-examination. Further, there is evidence that Dr. Kaplan reviewed some x-rays that may have satisfied the standard of care, so that is a matter for the jury to resolve. Finally, even though the Ramkelawans previously sued Dr. Kaplan for medical malpractice and have now changed their theory of liability, there is insufficient evidence for this Court to conclude that Dr. Brennan's opinions were fabricated solely for the purpose of litigation. Once again, that appears to be an interesting avenue of cross-examination.

So the Court will grant the uncontested portions of Globus's motion, but deny the contested portions.

### 2. Motion to exclude Dr. John Jarrell (Doc. 95).

### a. Dr. John Jarrell's opinion

The Ramkelawans retained biomedical engineering expert Dr. Jarrell to opine "that Mr. Ramkelawan's SECURE-C failed due to defects contained in the device's polymer core, that these defects caused Mr. Ramkelawan's SECURE-C to depart from the FDA's approved design specifications for the product, and that the SECURE-C's failure caused the polymer core to expel into Mr. Ramkelawan's cervical spinal cord." (Doc. 112, p. 18). More specifically, Dr. Jarrell will opine that:

1. The SECURE®-C Cervical Artificial Disc implanted in the plaintiff failed prematurely due to disassociation and expulsion of the polyethylene core from between the two endplates. The device was designed to retain the core between the two cobalt chromium endplates, but failed to do so. The product did not

function as designed or according the reasonable expectations and caused injury from the posterior disassociation and explusion of the implant core.

2. The SECURE®-C failure was caused by the devices defective condition and Globus's improper manufacture and inspection of the device prior to distribution.

3. The defect in the plaintiffs SECURE®-C Cervical Artificial Disc caused the product to lack adequate strength and stability for its designed and intended purpose. This resulted in an unsafe condition and injury to the plaintiff.

4. I have considered reasonable alternative explanations for the failure of the SECURE®-C Cervical Artificial Disc in this case and have concluded that the device's defective condition and Globus's improper production and distribution of the device is the most like! y cause of the failure.

5. The SECURE®-C device was defectively manufactured and improperly produced due to a manufacturing defect that was present in the device's polyetheylene core. During my inspection, features of the core did not meet critical dimensions and product specifications. The core spherical radius surface contained visual deformities in comparision to the intended design and inspection criteria as part of the design validation and drawings. The core spherical radius did not mate smoothly to the spherical endplate and would not have articulated smoothly with the endplate. Failure of the cylindrical or spherical radius fit results in a product that would not be suitable for use or function as intended. The core thickness ("Total Height") was out of specification during my inspection and not attributed to the explantation procedure. I obtained an average of Globus specified a minimum of and maximum. My lowest measurement was 0.19 mm out of specification. The other two measurements for width and depth were within specification (GM 000032). (Globus documented an example where total height of a core was still within specification upon explantation after 3.5 months of use.)

6. I have considered alternative explanations for the dimensional defect and the visual deformities with the "spherical curvature" of the core and have concluded that the product was defectively manufactured and improperly produced. The core was most likely outside of the design specifications at the time the SECURE®-C device was manufactured and produced.

7. In the absence of a manufacturing defect and Globus's improper production of the SECURE®-C Cervical Artificial Disc, the implant would not have failed as it did in this case.

(Doc. 95-2). Globus places these seven opinions in two categories. First, Globus argues that Dr. Jarrell opines there are two manufacturing defects in the subject SECURE-C core: (1) a misshaped dome and (2) an insufficient total core height. Dr. Jarrell also noticed a burr in the inferior endplate. Second, Globus argues Dr. Jarrell opines these defects caused the core to migrate between the two SECURE-C endplates. (Doc. 95, p. 5).

### b. Analysis

Globus seeks to exclude Dr. Jarrell's testimony for the following reasons:

- First, Globus argues Dr. Jarrell is not qualified to provide his opinions because (1) Jarrell has no experience with the SECURE-C device, other cervical disc replacement implants, or polyethylene components for spinal implants; (2) Jarrell has no experience with SECURE-C (or other spinal implants with polyethylene cores) manufacturing and is not an FDA regulatory expert; and (3) Jarrell's opinions were developed solely for this litigation.

- Second, Globus argues Dr. Jarrell's opinions regarding the purported defects are unreliable because (1) his opinion that the alleged defects existed when the SECURE-C was implanted and would have been visually apparent is refuted by the testimony of Dr. Kaplan and the surgical technician who both inspected the device before it was implanted and observed no visual defects; and (2) Jarrell admits that the alleged manufacturing defects to the core could have occurred when the core was expelled.

- Third, Globus argues Dr. Jarrell's opinions are unreliable and not based on a sound methodology because (1) he failed to rule out the reasonable alternative

that all the observed deformities to the core—as opposed to only some—were caused during the core's expulsion and (2) he could not answer questions about a potential relationship between the deformities he admits were caused by expulsion and the deformities he alleges were manufacturing defects.

- Fourth, Globus argues there is no factual foundation to support Dr. Jarrell's opinion that the alleged defects occurred during the manufacturing process given he cannot point to any manufacturing record showing a deviation from the PMA-approved manufacturing process or state with specificity how, when, or where the alleged defects occurred. Because Dr. Jarrell cannot say when the alleged defects occurred, his opinions are speculative and will not assist the jury.

- Fifth, Globus argues Dr. Jarrell's opinion that there was a burr on the inferior endplate should be excluded because he performed no quantitative measurement of the alleged burr, did not review CT scans to confirm the presence of the burr, and ignores evidence that there was no burr present.

- Sixth, and finally, Globus argues Dr. Jarrell's opinions that the alleged defects regarding dome shape, insufficient core height, and an alleged burr caused the core to expel and injure Ramkelawan should be excluded for these reasons: (1) the opinions are not based on sound methodology because Dr. Jarrell cannot explain how the alleged defects would have caused the core to migrate and he has never performed mechanical testing of the SECURE-C; (2) Dr. Jarrell conducted no scientific calculation to validate his opinion, such as verifying at what height a SECURE-C core migrates or what kind of dome deformation

causes a core to migrate; (3) Dr. Jarrell's causation opinions are based on conjecture as he merely identified alleged defects and then concluded those defects caused the core to expel; (4) Dr. Jarrell fails to explain how the presence of a burr can cause the core to expel; and (5) Dr. Jarrell failed to rule out reasonable alternative explanations for the core's expulsion, including hypermobility and instability of Ramkelawan's spine, which was observed by Dr. Kaplan, and the possibility that the endplates were misaligned during implantation of the SECURE-C.

Having considered Globus's arguments and the Ramkelawans' response, the Court concludes the motion is due to be granted in part. The Court concludes that Dr. Jarrell is qualified to offer an opinion about the alleged manufacturing defects he observed (*i.e.*, that the misshapen dome, insufficient core height, and the existence of a burr resulted from the manufacturing process), but the Court agrees with Globus that the Ramkelawans have not shown that Dr. Jarrell's opinion that these defects caused the core to expel is based on a sound scientific methodology.

Dr. Jarrell's report offers little more than a conclusion when it comes to his causation opinions. Dr. Jarrell opines, "The SECURE®-C failure was caused by the devices defective condition and Globus's improper manufacture and inspection of the device prior to distribution." (Doc. 95-2, p. 6). Dr. Jarrell also opines, "In the absence of a manufacturing defect and Globus's improper production of the SECURE®-C Cervical Artificial Disc, the implant would not have failed as it did in this case." (Doc. 95-2, p. 14). Finally, Dr. Jarrell opines, "A properly manufactured core would not have experienced

expulsion/migration during patient use as occurred in this case." (Doc. 95-2, p. 16). While Dr. Jarrell offers these opinions, he fails to explain how he reached these conclusions, which appear to be little more than *ipse dixit*—especially since Dr. Jarrell did no independent testing to confirm such defects could cause the core to expel from the endplates. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Further, Dr. Jarrell could not explain how he reached his causation opinions during deposition. (Doc. 95-1). Absent some reliable methodology—to which the Ramkelawans have not directed this Court—Dr. Jarrell's causation opinions must be excluded.

So the Court will grant the motion to the extent Dr. Jarrell's causation opinions are excluded, but will deny the motion to the extent that he can opine that the observed defects originated during the manufacturing process.

### 3. Motion to exclude Dr. Russell Dunn (Doc. 96)

#### a. Dr. Russell Dunn's opinion

The Ramkelawans retained Dr. Dunn to offer the following opinions: "the SECURE-C's polymer core was defective due to the presence of unacceptable levels of oxidation and deformation of the spherical aspect of the core, that these defective conditions most likely occurred during the manufacturing process, and how these defective conditions negatively affect the function of the polymer used to make the SECUREC's core." (Doc. 112, p.6). More specifically, in his report, Dr. Dunn offers these opinions:

1. The subject SECURE-C core exhibits significant damage on the superior side. Specifically, there are crescent shaped depressions in the surface and severe deformation on the anterior aspect of the superior side of the subject SECURE-C core.

2. The damage observed on the subject SECURE-C core is consistent with damage observed on other explanted SECURE-C cores that have failed.

3. The subject SECURE-C core exhibits levels of oxidative degradation; thus, reducing its mechanical strength.

4. The subject SECURE-C core is made from Ticona GUR 1020 Ultra-High Molecular Weight Polyethylene that has no antioxidant present in the formulation.

5. Oxidative degradation of the GUR 1020 UHMWPE would most likely occur during the air drying operation of the subject SECU RE-C core in an oven at 50°C for over 19 hours.

6. No testing of SECURE-C cores for oxidative degradation, using FTIR spectroscopy, occurs after the air drying operation.

7. Deformation of the subject SECURE-C core superior side most likely occurred during machining of the final component.

8. Oxidative degradation combined with poor manufacturing processes most likely contributed to the failure of the SECURE-C core.

9. The subject SECURE-C core most likely experienced oxidative degradation during manufacturing processes.

10. Crescent shaped deformation of the subject SECURE-C core superior side is consistent with the size of the circular contact on the Superior End plate and is consistent with angular stress from the Superior End plate on the core.

11. SEM photos of the subject SECURE-C core show [sic] are consistent with cutting with a worn or highly worn tool.

12. Only a small portion (sample testing) of the SECURE-Care visually and dimensionally inspected prior to implantation.

13. SECURE-C cores with observable surface depressions and other damage would not pass the surface roughness specification [] established by Globus Medical.

14. SECURE-C cores are not individually evaluated for surface roughness before implantation.

15. UHMW-PE that has not been oxidized and that has low surface roughness is known to have high abrasion resistance and impact strength.

16. There is no evidence of a formal safety analysis of the SECURE-C safety analysis, such as a Failure Mode and Effects Analysis recommended by ISO 14971, of the SECURE-C core design (dFMEA) and/or manufacturing process (pFMEA).

17. The severity associated with oxidative degradation of SECURE-C cores should have resulted in process and testing safeguards to minimize or eliminate this potential failure mode. Example of safeguards include, but are not limited to, FTIR testing of the SECURE-C core prior at key points in the manufacturing process and drying of the core in an inert nitrogen environment in the manufacture of SECURE-C cores.

18. The severity associated with either oxidative degradation a subject SECURE-C core or poor surface morphology after machining should have led to 100% inspection of SECURE-C cores prior to distribution.

19. Surface roughness of the SECURE-C core should be evaluated for each component prior to device distribution.

20. The subject SECURE-C core was improperly manufactured and produced.

21. The severity associated with an improperly manufactured core should have resulted in process safeguards to minimize or eliminate failure modes attributed to manufacturing deficiencies.

22. Failure of the subject SECURE-C core was foreseeable and avoidable.

(Doc. 96-1, pp. 12–14).

**b. Analysis**

Globus seeks to exclude Dr. Dunn's opinions for the following reasons:

- First, Globus argues that Dr. Dunn is not qualified to offer his opinions because

  (1) he admittedly is not a biomedical or biomechanics expert, or an expert on

  PMA-approved devices, the SECURE-C, the FDA or its approval process, the

21

safety and effectiveness of medical devices, spinal products using polyethylene, or how medical products act inside the body, and (2) Dr. Dunn has been found unqualified to opine regarding medical devices in multiple other cases. *See Frankum v. Bos. Sci. Corp.*, No. 2:12-CV-00904, 2015 WL 1976952, at \*16 (S.D.W. Va. May 1, 2015) ("Unable to draw on some special skill, knowledge, or experience related to medical devices, Dr. Dunn's opinions, including those based on his testing of BSC products, will not be helpful to the trier of fact as required by Federal Rule of Evidence 702."); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at \*21 (S.D.W. Va. May 19, 2016) ("I find that Dr. Dunn does not have the requisite skill, knowledge, training, education, or experience to qualify as an expert in this case, and his opinions are **EXCLUDED**."); *Mathison v. Bos. Sci. Corp.*, No. 2:13-CV-05851, 2015 WL 2124991, at \*22 (S.D.W. Va. May 6, 2015) (same); and *Wilkerson v. Bos. Sci. Corp.*, No. 2:13-CV-04505, 2015 WL 2087048, at \*18 (S.D.W. Va. May 5, 2015) (same).

- Second, Globus argues that Dr. Dunn did not employ a scientific methodology in reaching his opinions that the SECURE-C core was defectively manufactured.

- Third, Globus argues Dr. Dunn cannot opine that some evidence of oxidation of the core is a manufacturing defect because (1) Dr. Dunn cannot rule out that the oxidation occurred in the 3.5 years after the core was explanted before he inspected it; (2) Dr. Dunn is not qualified to opine whether some evidence of oxidation on the core's surface constitutes a deviation from the PMA because he

has no expertise in the FDA or PMA process; (3) there is no factual basis to support Dr. Dunn's opinion that some evidence of oxidation is a defect since neither industry standards nor the PMA-approved specifications prescribe an oxidation level for the core; (4) Dr. Dunn has not opined that the oxidation to the core resulted from violating any PMA requirement, which is necessary to demonstrate a manufacturing defect; (5) Dr. Dunn's opinion is not based on a reliable methodology because he cannot quantify the amount of oxidation and he has not tested his theory that oven drying the core caused oxidation; and (6) Dr. Dunn acts as a litigation advocate rather than an independent expert.

- Fourth, Globus argues Dr. Dunn's opinion that the core's surface roughness did not meet FDA-approved specification should be excluded as unreliable because: (1) Dr. Dunn did not measure the core's surface roughness and (2) Dr. Dunn's opinion that the surface roughness was caused during the core's machining is based on conjecture.

- Fifth, Globus argues Dr. Dunn's opinions should be excluded because they will not assist the trier of fact because they do not fit the facts of the case. More specifically, Globus argues that neither Dr. Dunn nor any other expert has opined that the core's surface oxidation—even if it occurred during manufacturing— caused the core to expel from the endplates.

- Sixth, and finally, Globus argues that Dr. Dunn's opinions that are critical of the FDA-approved inspection and testing are unreliable and preempted.

The Court agrees with Globus that Dr. Dunn's opinions should be excluded. First, despite Dr. Dunn's opinion that the core was oxidized and not to specification in regard to surface roughness, he fails to point to any FDA-approved specification with which these observations are inconsistent. Further, Dr. Dunn does not point to any manufacturing process with which Globus did not comply. And contrary to the Ramkelawans' assertions, there does not appear to be any correlation between Dr. Dunn's testimony regarding oxidation and surface roughness, and the resulting failure of the subject SECURE-C core. So even assuming the core was defectively manufactured such that there was oxidation and an issue with the core's surface roughness, neither Dr. Dunn nor any other expert has opined these defects caused the SECURE-C core to explant and injure Ramkelawan.

While the Ramkelawans argue that "combined with Dr. Jarrell's opinions[], Dr. Dunn's testimony will allow the jury to determine whether the manufacturing defects present in the polymer core caused Mr. Ramkelawan's SECURE-C to fail on the day of the incident," it is clear that Dr. Jarrell did not consider Dr. Dunn's conclusions when considering the cause of the core's expulsion. (Doc. 96-8, *Deposition of Dr. Jarrell*, 21:22–25 ("Q: Okay. So did you rely upon Dr. Dunn for any opinions relating to whether there was a manufacturing defect relating to the core? A: No."); 22:8–16 ("Q: All right. So you did not rely on Dr. Dunn at all for his opinions in any way? I'm trying to determine the relationship, if there is one, between his opinions and your own. A. That's correct. Q. What is the relationship? Can you explain that to me, again, because I think I'm missing it. A. I would say I don't really know what his opinions are.")). Regardless, this Court's ruling prohibiting Dr. Jarrell from opining on the cause of the SECURE-C's failure would prevent

him from showing the oxidation caused the SECURE-C core to expel even if he had relied on Dr. Dunn's opinion.

So because there is no evidence that the alleged defects observed by Dr. Dunn caused the SECURE-C to fail and injure Ramkelawan, the Court concludes Dr. Dunn's testimony would not assist the trier of fact.

### 4. Motion to exclude Dr. Craig Lichtblau (Doc. 98)

#### a. Dr. Craig Lichtblau's opinion

Globus challenges three of the opinions of Dr. Craig Lichtblau, who the Ramkelawans retained to opine about Ramkelawan's physical and mental condition, and to project Ramkelawan's future medical, treatment, and healthcare needs. Specifically, Globus seeks to exclude these opinions: (1) Dr. Lichtblau's opinion on Ramkelawan's impairment rating; (2) Dr. Lichtblau's opinion that Ramkelawan suffers from depression and anxiety; and (3) Dr. Lichtblau's opinion that the SECURE-C malfunctioned and caused Ramkelawan's medical conditions. The Ramkelawans oppose exclusion of the first two opinions, but do not oppose exclusion of the third since Dr. Lichtblau was not retained to opine on whether the SECURE-C malfunctioned or the cause of Ramkelawan's injuries.

#### b. Analysis

At issue are two of Dr. Lichtblau's opinions, the first regarding Ramkelawan's impairment rating and the second regarding whether Ramkelawan suffers from depression and anxiety. The Court concludes neither opinion should be excluded.

As to the impairment rating, Globus argues that the opinion will not assist the trier of fact because it is within a lay person's understanding that a quadriplegic would

necessarily be dependent upon others for his daily needs. The Ramkelawans argue that the impairment rating will assist the trier of fact in determining how severe Ramkelawan's injuries are, which help the jury determine the value of Mr. Ramkelawan's damages. The Court agrees with the Ramkelawans that, at least on the evidence before the Court at this time, Dr. Lichtblau's opinion on Ramkelawan's impairment rating could assist the jury.

But Globus argues that even if the opinion would assist the trier of fact, the opinion should still be excluded under Rule 403 because the probative value of the opinion is substantially outweighed by the danger of misleading or confusing the jury. The Court disagrees. Globus's concerns can be properly addressed during cross examination and do not substantially outweigh the probative value of the opinion.

As to Dr. Lichtblau's opinion that Ramkelawan suffers from depression and anxiety, Globus argues the opinion is unreliable and based solely on Dr. Lichtblau's speculative conclusion. For this argument, Globus relies on Dr. Lichtblau's deposition testimony and ignores his written report. In that report, Dr. Lichtblau noted, "[Ramkelawan] states he is depressed about his current situation." (Doc. 98-2, p. 6). Based on the written report, the Court concludes a sufficient basis supports Dr. Lichtblau's opinion that Ramkelawan suffers from depression and anxiety. To the extent Globus challenges this opinion, it can cross-examine Dr. Lichtblau as to the basis for his opinion.

So the Court concludes Globus's motion should be denied as to Dr. Lichtblau's contested opinions, but granted to the extent that Dr. Lichtblau cannot opine as to the whether the SECURE-C malfunctioned since he was not retained to offer that opinion.

Accordingly, it is ORDERED AND ADJUDGED that:

1.      Plaintiffs Winston Ramkelawan and Vindra Ramkelawan's *Daubert* Motion to Strike and Exclude the Opinions and Testimony of Nicholas Benetatos (Doc. 99) is DENIED.

2.      Plaintiffs Winston Ramkelawan and Vindra Ramkelawan's *Daubert* Motion to Strike and Exclude the Opinions and Testimony of Dr. Rajesh Bhojwani (Doc. 101) is DENIED.

3.      Defendant Globus Medical Inc.'s Motion to Exclude Dr. William Brennan's Expert Opinions (Doc. 94) is GRANTED IN PART AND DENIED IN PART as explained in this Order.

4.      Defendant Globus Medical Inc.'s Motion to Exclude John Jarrell's Expert Opinions (Doc. 95) is GRANTED IN PART AND DENIED IN PART as explained in this Order.

5.      Defendant Globus Medical Inc.'s Motion to Exclude Russell Dunn's Expert Opinions (Doc. 96) is GRANTED.

6.      Defendant Globus Medical Inc.'s Motion to Exclude Dr. Craig Lichtblau's Expert Opinions (Doc. 98) is GRANTED IN PART AND DENIED IN PART as explained in this Order.

**DONE** and **ORDERED** in Tampa, Florida, this 10th day of December, 2019.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

27